UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

MAIDEN LANE HOSPITALITY GROUP LLC          Case No.: 18-cv-7476
and POTENTIS CAPITAL LLC,

                                    Plaintiffs,

        v.                                                    **VERIFIED COMPLAINT**

DAVID CORY BECK, BY DAVID COMPANIES,
INC., STEVEN R. WEINSTEIN, ZBRELLA, INC.,          (Jury Trial Demanded)
OPAL HOSPITALITY GROUP, INC. DBA MAIDEN
LANE EVENTS, AND CREATIVE CONCEPTS NYC, INC.

                                    Defendants.
_____

        Plaintiffs MAIDEN LANE HOSPITALITY GROUP LLC and POTENTIS CAPITAL LLC

(collectively, "Plaintiffs") bring this action by this VERIFIED COMPLAINT, by and through its

undersigned counsel.  Each of the Plaintiffs alleges the following based upon its personal knowledge

as to itself and its own actions, and on information and belief as to all other matters based upon

investigation conducted by it and also by and through counsel, against DAVID BECK, BY DAVID

BECK COMPANIES, INC., STEVEN R. WEINSTEIN, ZBRELLA, INC., and OPAL

HOSPITALITY GROUP, INC. DBA MAIDEN LANE EVENTS, AND CREATIVE CONCEPTS

NYC, INC. (collectively, "Defendants"):

## Introduction

        1.        David Cory Beck ("Beck") approached Potentis Capital LLC ("Potentis") in February

2017 for Potentis to invest at least $260,000.00 into Maiden Lane Hospitality Group LLC

("MLHG"). During many meetings, telephone calls and emails, Beck and MLHG's accountant and

CPA, Steven R. Weinstein ("Weinstein"), made many representations and warranties to Potentis

6833969v1

including that (a) MLHG was a very good business that having only been formed in 2015 suffered from being under-capitalized, and (b) an investment of about $260,000.00 would make MLHG profitable and self-funding in short order.

2.      In the guise of MLHG being a disorganized start-up such that no one would be able to understand MLHG's cash, revenue and expense transactions, Beck and Weinstein hid from Potentis the fact that they had set up MLHG's books and records for MLHG to function as Beck's personal piggy bank to support his and his family's Upper East Side lifestyle.  Beck and Weinstein did not disclose to Potentis, among other material omissions, that:

a.      MLHG's losses were due to MLHG's cash transactions not being recorded on MLHG's books and records or on MLHG's sales tax and other tax returns;

b.      MLHG's cash, accounts receivable and revenue were routinely siphoned off by Beck for his personal and his family's personal use;

c.      Beck and Weinstein purposefully caused MLHG to have no systems of internal control so that tracking cash, revenues and expenses was made purposefully difficult if not virtually impossible;

d.      Despite a prohibition in the MLHG limited liability company operating agreement on compensation being paid to Beck, Beck caused another, independent company, Creative Concepts NYC, Inc. ("Creative"), to fold its operations in whole or in part into MLHG solely to allow Beck to pay himself a salary at the rate of $125,000/year;

e.      Weinstein and Beck caused MLHG to file a doing business or assumed name certificate with the New York Secretary of State on August 16, 2016 so that MLHG could do business as "Creative Concepts NYC" to allow Beck between September 8, 2016 and October 27, 2016, to cause MLHG to spend at least $148,848.98 in MLHG DBA Creative Concepts NYC funds,

including payments to Beck and some payments to Creative principals and employees, a sum in excess of revenues such that MLHG lost money in its transactions with Creative;

f.      Beck used his personal bank accounts and the bank accounts of Beck's personal company By David Companies, Inc. ("By David") to comingle his own funds and By David funds with MLHG's funds to make MLHG's books and records false and misleading and very difficult to analyze for accuracy;

g.      Beck diverted nearly $45,000.00 in accounts receivables due to MLHG to Beck personally; diverted at least $93,419.44 in MLHG cash over an 11 month period; and misappropriated at least $103,451.78 of MLHG's other funds over a five month period for Beck's and his family's personal cooperative apartment maintenance charges, groceries and sundries at Upper East Side stores such as Duane Reade and Key Food, charges at Upper East Side restaurants, personal car garage, personal valet/dry cleaning services, and personal pocket cash; and

h.      Beck caused all or nearly all of MLHG's accounts with vendors to be under his personal control rather than under MLHG's company control as part of Beck's scheme to allow no one other than Beck to have the ability to control MLHG's operations to have access to MLHG's books and records.  Beck enlisted one of those outside IT vendors, Zbrella, Inc. ("Zbrella"), to aid and abet Beck's frauds and to perpetuate Beck's personal control over MLHG's computer servers and email accounts to the detriment of MLHG and its investors such as Potentis.

3.      Beck also used his personal company Opal Hospitality Group, Inc. ("Opal") to divert MLHG corporate opportunities and MLHG's common law service mark and trade name "Maiden Lane Events" to Opal for Beck's personal benefit.

4.      In reliance on the frauds and misrepresentations of Beck and Weinstein, Potentis made its investment in and purchased $300,000 of MLHG securities by making a capital

contribution of $200,000.00 in cash and $100,000.00 in services, and entered into the MLHG limited liability company operating agreement which amounted to an investment contract under which Potentis was relying on Beck, as the then-sole manager of MLHG, to apply those Potentis funds to right the MLHG ship and to cause MLHG to become cash flow positive and profitable in short order as Beck and Weinstein represented would happen.

5.      Beck's and Weinstein's frauds continued after Potentis made its investment and executed and delivered the MLHG operating agreement.  Potentis had no ability on its own to remove Beck or Weinstein from their control over MLHG.  Potentis has as of today invested more than $2,200,000.00 to address and remedy the frauds and misrepresentations perpetrated by Beck and Weinstein.

6.      This action seeks relief in favor of Potentis that includes recovery for losses resulting from its investment in MLHG, as well as relief in favor of MLHG for losses and its lost profits resulting from the frauds and other torts, breaches of fiduciary duty, and breaches of contract of the Defendants.

### Jurisdiction and Venue

7.      The claims asserted in this Complaint arise under:

a.      The Computer Fraud and Abuse Act, 18 U.S.C. §1030(e)(2);

b.      The Defend Trade Secrets Act, 18 U.S.C. §1836(b);

c.      The Electronic Communications Privacy Act 18 U.S.C. §2510;

d.      The Lanham Act, 15 U.S.C. §1125; and

e.      Section 10(b) of the Securities and Exchange Act, 15 U.S.C. §7j(b) ("Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. §240.10b-5.

8.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367.

9.      Venue is proper in this judicial district pursuant to 29 U.S.C. §1391(b), §27 of the Exchange Act, 15 U.S.C. §78aa, and 29 U.S.C. §1391(b) because one or more of the Defendants conducts business within this judicial district, a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred in this judicial district, and a substantial part of the property that is the subject of this action is situated in this judicial district.

10.     Each of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail and interstate telephone and email communications, in connection with the acts, conduct and other wrongs alleged in this Complaint.

## Parties

11.     Plaintiff Maiden Lane Hospitality Group LLC (MLHG) is a limited liability company organized on February 9, 2015 under the laws of the State of New York.  MLHG's principal place of business is in New York County, New York.

12.     MLHG was formed under the name "Smith & Beck Hospitality Group LLC" and on April 28, 2015 changed its name to "Maiden Lane Hospitality Group LLC."  Joseph Smith, one of the original Members of MLHG, was and remains listed as MLHG's agent for service of process but is no longer a Member of MLHG.  Joseph Smith's 17% interest in MLHG was purchased by MLHG.

13.     Plaintiff Potentis Capital LLC (Potentis) is a limited liability company organized under the laws of the State of Delaware, since June 10, 2014 has been and continues to be registered

and qualified to do business in the State of New York, and has its principal place of business in New York, New York.

14.     Defendant David Cory Beck (Beck) is an individual residing at 1735 York Avenue, Suite 26F, New York, New York 10128.

15.     Defendant By David Companies, Inc. (By David) is a corporation organized under the laws of the State of New York with a principal place of business at 1735 York Avenue, Suite 26F, New York, New York 10128, which is the same address as Beck's personal residence.  By David is wholly-owned by Beck.

16.     Defendant Steven R. Weinstein (Weinstein) (a) is a Certified Public Accountant ("CPA"), (b) who performed accounting and tax services to Beck individually, to Opal, to By David, and to MLHG, (c) is Beck's uncle, (d) resides at 4 Deerfield Lane, Katonah, New York, and (e) is an individual.

17.     Defendant Zbrella, Inc. (Zbrella) is a corporation organized under the laws of the State of New York with a principal place of business at One Penn Plaza, Suite 6222, New York, New York 10019.

18.     Defendant Opal Hospitality Group, Inc. (Opal) is a corporation organized on August 22, 2017 under the laws of the State of New York with an address for service of process at c/o Okin Edelman P.C. 3000 Marcus Ave., Suite 3W10, Lake Success, New York 11042.  Opal conducts business from 1735 York Avenue, Suite 26F, New York, New York 10128, the same address as Beck's personal residence.  Opal does business as "Maiden Lane Events."  Opal is wholly-owned by Beck.

19.     Defendant Creative Concepts NYC, Inc. (Creative) is a corporation organized under the laws of the State of New York with a principal place of business at either 380 Lexington Ave, New York, NY 10168 or 3537 36th Street, Suite 431, Astoria, New York 11106.

20.     Beck and Weinstein caused MLHG to file an assumed name certificate with the New York Secretary of State on August 16, 2016 so that MLHG could do business as "Creative Concepts NYC."  MLHG (a) did conduct MLHG business under the name "Creative Concepts NYC" and (b) entered into a letter of intent dated as of June 9, 2016 and a management agreement and a partnership agreement, either written or verbal, with Creative on or about July 1, 2016 (collectively, the "CC Agreements").

21.     MLHG did not benefit, and Beck and his company By David and Creative's principals, were the only persons known to directly benefit from this MLHG arrangement with Creative and from the CC Agreements.  MLHG absorbed Creative expenses and paid salaries to Creative principals and employees.  Between September 8, 2016 and October 27, 2016, MLHG spent at least $148,848.98 in funds derived from MLHG DBA Creative Concepts NYC, including payments to Beck, Creative vendors, principals and employees.  The revenues to MLHG DBA Creative Concepts NYC were less than these expenditures, resulting in a loss to MLHG.

22.     Beck and Opal have misappropriated from MLHG and are using the MLHG common law service mark and trade name "Maiden Lane Events."  "Maiden Lane Events" (a) is a common law service mark and trade name that is and has been used by MLHG, and (b) is confusingly similar to MLHG's company name and to the common law service mark and trade name under which MLHG does business, namely "Maiden Lane Hospitality Group."

23.     Beck described himself as "President of Maiden Lane Events" in his MLHG email signature block so Beck was aware that "Maiden Lane Events" was and is a common law service

mark and trade name of MLHG. Beck changed his email signature block or had Zbrella do it for him sometime on or about May 30-31, 2017, from "David Cory Beck President Maiden Lane Hospitality Group" to "David Cory Beck President Maiden Lane Hospitality Group Maiden Lane Events".

24.     It was at or before this same May 30-31, 2017 time frame that Beck was aware that Potentis (a) had discovered many inexplicable irregularities in MLHG's books and records, and (b) had begun to institute internal accounting controls for MLHG such that it became more difficult for Beck to continue to divert MLHG cash and other funds to Beck and By David. On information and belief, at or about this time Beck planned to appropriate the "Maiden Lane Events" common law service mark and trade name to himself and to Opal which Beck incorporated on August 22, 2017 and which Opal used in its own business thereafter to the detriment of MLHG.

## Background

### The MLHG-Downtown Management Agreement:

25.     On or about July 15, 2015, MLHG entered into an Amended and Restated Management Agreement (the "Management Agreement") with Downtown NYC TRS, LLC ("Downtown") relating to the management and operation by MLHG of certain portions of a commercial building managed by Downtown at 180 Maiden Lane, New York, New York (the "Property").

26.     Pursuant to the Management Agreement, MLHG has the exclusive right to possess, use, manage, and operate: (a) the retail kiosk on the ground level of the Property, (b) the cafeteria, server, and kitchen areas (including seating areas) on the third and fourth floors of the Property; (c) the conference center located on the second floor of the Property; and (d) the fitness center on the

third floor of the Property.   Also pursuant to the Management Agreement, MLHG has legal ownership of all sales, revenue, and other cash and currency generated by MLHG's performance.

27.     The Management Agreement has a ten (10) year term, and provides MLHG with the option to renew and extend the Agreement for two (2) additional successive five (5) year terms.

**The MLHG Operating Agreement:**

28.      In order for MLHG to perform under the Management Agreement, Beck had the law firm of Okin Edelman P.C. ("Okin Edelman") draft a limited liability company operating agreement, dated August 15, 2015 ("Operating Agreement"), to which Beck and other persons were the parties as the "Members" of MLHG.

29.     Glenn S. Edelman ("Edelman"), a partner in Okin Edelman P.C., is a Beck relative. MLHG paid Edelman $12,500.00 on 1/7/16.

30.     At Beck's and Weinstein's direction, Okin Edelman (a) prepared and on August 16, 2016 filed the MLHG DBA Creative Concepts NYC assumed name certificate and (b) serves as Opal's office for service of process.

31.     The Operating Agreement provided that MLHG's business purpose was to enter into a Management Agreement with Downtown in order to provide certain catering and food & beverage services to the Property.

32.     The Operating Agreement established a day-to-day manager of MLHG (the "Manager").

33.     Paragraph 4.10 of the Operating Agreement named Beck and two other Members as a group of three (3) Managers.  The other two subsequently ceased to be Managers leaving Beck as the sole Manager of MLHG at the time Beck and Weinstein solicited Potentis's investment in MLHG securities and solicited MLHG to enter into the Operating Agreement.

34.     The Operating Agreement was an investment contract in that Potentis had to rely on Beck as MLHG's Manager to apply MLHG's invested funds and to make MLHG become at least break-even and then profitable and cash flow positive as Beck and Weinstein represented would occur if Potentis made the requested $300,000.00 investment and entered into the Operating Agreement.

**The Sale of MLHG Securities to Potentis:**

35.     In February 2017, after MLHG had been in operation for just over one year, and after Beck caused MLHG to have entered into the CC Agreements, Beck sought an investment in MLHG from Potentis.

36.     Potentis asked Beck for financial, operational and other information about MLHG as part of its due diligence for any potential investment in MLHG.

37.     Also as part of its due diligence, Potentis asked for, and Beck and Weinstein provided to Potentis, financial, operational and other information about MLHG, both verbally and in writing.

38.     Pursuant to a Membership Interest Acquisition and Option Agreement between Potentis and MLHG entered into on or about March 23, 2017 ("Acquisition Agreement"), (a) Potentis made its investment in MLHG securities of $200,000 in cash and $100,000 in services, and (b) Potentis agreed pursuant to Paragraph 10 of the Acquisition Agreement to make a further $100,000 available to MLHG as a demand loan bearing interest at the low rate of 3% per annum.

39.     In the Acquisition Agreement Beck MLHG made the following representation and warranty to Potentis: "MLHG represents and warrants that it has to best of its ability, provided to and disclosed to Potentis, all relevant, accurate, and pertinent financial and business information including but not limited to: current financial statements, any and all current or potential litigation

matters as they relate to MLHG and/or any of its Members, and any other information Potentis may find useful in making the decision to enter into this Agreement."

40.     Paragraph 3(a) of the Acquisition Agreement provides: "MLHG represents, warrants and agrees, that all of such $200,000 paid by Potentis will be used by MLHG solely for MLHG's payment of operational, vendor, and/or other costs necessary for the sustainability and growth of MLHG (and not payments to any Member of MHLG or to any of such Member's affiliates)."

41.     MLHG's representations and warranties in the Acquisition Agreement and verbally and by email to Potentis in connection with the Acquisition Agreement were (a) caused to be made by Beck and Weinstein, (b) materially false and misleading when made, (c) caused to be false and misleading by Beck and Weinstein, (d) known to Beck and Weinstein to be false and misleading when made, (e) made to induce Potentis to purchase MLHG securities, to enter into the Operating Agreement, and to invest cash into and to provide valuable services to MLHG, cash and services that Beck needed for MLHG to continue in business so Beck could continue his undisclosed diversion of MLHG cash and other funds to himself and his companies; (f) materially false and misleading regarding the sales, revenues, profits, expenses, liabilities, and overall financial health and operations of MLHG, and (g) knowingly and intentionally false or misleading and contained material omissions as to the sales, revenues, profits, expenses, liabilities and financial health and operations of MLHG.

42.     Potentis in fact made its investment of $300,000 and did purchase MLHG securities in the form of a limited liability company membership interest, plus options to acquire further interests, pursuant to the Acquisition Agreement, and did so in reliance on Beck's and Weinstein's representations and information provided to Potentis and the same being accurate and complete and not false or misleading in any material respect.

43.     What Potentis did not know, and what MLHG's other Members did not know, but Beck and Weinstein did know, was that the false and misleading financial and other information Beck and Weinstein gave to Potentis to induce Potentis to purchase MLHG securities and to execute and deliver the Operating Agreement, which to Potentis was an investment contract, included the facts that:

a.      MLHG's revenues were overstated because Beck and Weinstein had devised a scheme to strip MLHG of all or most of its cash receipts;

b.      Beck and Weinstein caused MLHG not to record its daily cash receipts in MLHG's books and records;

c.      MLHG's expenses were understated because many of MLHG's liabilities to vendors were omitted in the data provided to Potentis;

d.      MLHG's expenses were further understated because Beck and Weinstein had devised a scheme for MLHG to under-report sales revenues and not account for the cash being paid out to Beck or to By David, and thereby cause MLHG to report a lower than accurate sales number for New York sales tax reporting and payment purposes and a lower than accurate expense number for MLHG;

e.      There was no disclosure of cash taken or diverted by Beck and payments of MLHG funds to Beck or to By David for Beck's and Beck's wife's personal expenses; and

f.      There was no disclosure of the CC Agreements or of Beck's $125,000 annual rate of salary pursuant to the CC Agreements or the CC Agreements' requirement that By David provide the event staffing for MLHG DBA Creative Concepts NYC events, all in violation of the Operating Agreement.

44. Beck gave Potentis wire instructions to send $20,000 of Potentis's $200,000.00 cash investment to what Potentis believed was a MLHG bank account but in fact was Beck's personal retirement account. Potentis sent that $20,000 on April 11, 2017 via the Automated Clearing House electronic network for transmitting funds ("ACH"). Potentis understood that $20,000.00 was to be a cash advance by MLHG to Beck against commissions due to Beck under the Operating Agreement. Some of the other funds invested by Potentis were diverted by Beck to his personal use as described in this Complaint.

45. While serving as the Manager of MLHG, pursuant to a scheme devised by Beck and Weinstein, and with the knowing and intentional assistance of Weinstein, Beck abused his authority as Manager and when Beck ceased to be a Manager, by wrongfully diverting, and regularly causing hundreds of thousands of dollars of MLHG funds to be transferred by wire, by check and by cash withdrawals from bank tellers and ATMs, to Beck personally, to Beck's personal retirement account and to By David bank accounts, all of which was intended, ultimately, to enrich Beck personally at the expense of MLHG. Beck would deposit some money back into MLHG accounts.

46. Beck's comingling of MLHG funds with his personal funds and By David funds was intentional and designed by Beck and Weinstein to obfuscate and make it impossible for any third party to discover MLHG's real financial condition, cash receipts, revenues, expenses and profits and losses.

47. Beck and Weinstein concealed from MLHG, Potentis and MLHG's other Members those diversions of funds to or for the benefit of Beck. That concealment made MLHG's books and records materially false and misleading.

48. For example, with the intentional and knowing assistance of Weinstein:

a.    Beck caused MLHG to pay to himself via check or wire transfer as "Owner's Draw" payments of at least the following amounts on at least these dates:

$10,192.31 on 7/2216;
$10,192.31 on 8/1/16;
$100.00 on 8/1/16;
$600.00 on 8/8/16;
$15,288.46 on 8/9/16;
$5,000.00 on 10/27/16;
$5,000.00 on 10/27/16; and
$500.00 on 10/27/16.

These amounts total $46,873.08 over this three month period.  Beck's payment of this "Owner's Draw" to himself was not disclosed to Potentis and was in violation of the Operating Agreement prohibiting compensation to Beck.

b.    Beck caused MLHG to pay to himself via check or wire transfer as a payment to "David Beck" at least the following amounts on at least these dates:

$30,192.31 on 7/5/16;
$5,096.16 on 7/11/16;
$1,000.00 on 7/11/16;
$10,192.31 on 8/1/16;
$600.00 on 8/5/16;
$15,288.46 on 8/9/16;
$5,096.16 on 8/25/16;
$5,096.16 on 8/29/16;
$5,096.15 on 9/2/16;
$5,096.15 on 9/12/16; and
$20,697.90 on 12/12/16.

These amounts total $103,451.78 over this five month period.  Beck's payment of these sums to himself was not disclosed to Potentis and was in violation of the Operating Agreement prohibiting compensation to Beck.

c.    Beck made cash withdrawals from MLHG's bank accounts via ATMs and directly from MLHG's banks on a regular basis; neither MLHG nor Potentis knows if Beck reported these

cash payments as income on his income tax returns.  For example, Beck withdrew the following

amounts of cash on the following dates:

$600.00 on 8/8/16;
$200.00 on 9/26/16;
$503.00 on 9/30/16;
$503.00 on 10/3/16;
$503.00 on 10/11/16;
$503.00 on 10/11/16;
$503.00 on 10/11/16;
$503.00 on 10/26/16;
$503.00 on 10/2716;
$600.00 on 1/11/17;
$600.00 on 12/19/17;
$15,000.00 on 2/1/17;
$444.00 on 2/6/17;
$500.00 on 2/8/17;
$500.00 on 2/24/17;
$500.00 on 2/27/17;
$500.00 on 3/1/17;
$1,500.00 on 3/2/17;
$2,500.00 on 3/3/17;
$400.00 on 3/6/17;
$500.00 on 3/6/17;
$500.00 on 3/7/17;
$381.00 on 3/8/17;
$119.00 on 3/8/17;
$500.00 on 3/8/17;
$200.00 on 3/9/17;
$800.00 on 3/9/17;
$3,800.00 on 3/10/17;
$1,000.00 on 3/16.17;
$800.00 on 3/16/17;
$200.00 on 3/16/17;
$774.00 on 3/13/17;
$10,000.00 on 3/13/17;
$500.00 on 3/15/17;
$20,000.00 on 3/17/17;
$7,500.00 on 3/17/17;
$1,000.00 on 3/17/17;
$300.00 on 3/21/17;
$500.00 on 3/21/17;
$1,500 on 3/24/17;
$2,000.00 on 3/24/17;
$3,100.00 on 3/24/17;

$400.00 on 3/27/17;
$203.50 on 3/27/17;
$600.00 on 3/30/17;
$500.00 on 4/3/17;
$2,183.75 on 4/6/17;
$1,688.69 on 4/18/17;
$600 on 5/16/17;
$23.00 on 5/30/17;
$260.00 on 6/5/17;
$2,000.00 on 6/6/17;
$800.00 on 6/12/17;
$800.00 on 6/13/17;
$21.50 on 7/3/17.

These cash withdrawals total $93,419.44 over 11 months.  Beck's payment of these sums to himself was not disclosed to Potentis and was in violation of the Operating Agreement prohibiting compensation to Beck.

d.       Beck caused MLHG to pay Beck weekly $91.85 usually by check, including on 7/1/16, 7/14/16, 7/20/16, 7/21/16, 7/28/16, 8/4/16, 8/11/16, 8/18/16, 8/25/16, 9/1/16, and 10/20/16. MLHG believes that $91.85 was net of income tax withholding, making those payments a gross of $100.00/week to Beck.

e.       Beck diverted funds due to MLHG on at least three occasions: $19,602.27 on 7/21/17 and $25,000 on 7/7/17, totaling $44,602.27; and $4,562.18 on or about 8/14/17.

f.       Beck also paid himself a total of approximately $20,321.50 from MLHG's Chase Bank accounts during a seven month period in 2017.

g.       Beck caused MLHG to pay Beck's personal expenses on a regular basis, including Beck's use of the MLHG credit card, to charge $24.17 for Key Food on 9/13/16, $26.32 for Key Food on 9/15/16, wine or liquor from East Side Cellars for $40.02 on 9/29/16; $23.37 to Hamilton Valet on 10/7/16; $460.00 to York Parking on 10/1/16 for Beck's personal garage near his residence; $754.50 to Saks on 10/17/16; $958.00 to Barney's on 10/19/17; $98.40 on 10/1116 to The Mansion

Restaurant near Beck's residence; and other charges on a regular basis to vendors such as Amazon, Apple Store, United Fin. Casualty for insurance premiums and other wine and liquor retailers that appear to be personal to Beck and not for MLHG.

h.     The foregoing does not include (1) the disappearance of thousands of dollars of green cash from MLHG's safe over which Beck had exclusive control and (2) other withdrawals and transfers that bear no explanation on MLHG's books and records, such as a withdrawal of $6,010.37 on 10/27/16 recorded only to "General Journal"; $14,000.00 and $12,000.00 on 10/7/16 and $2,454.94 on 8/20/16 and $17,586.21 on 8/31/16, in each case with no explanation or payee.  Many of the entries for Beck's withdrawals of funds from the By David accounts were listed as "Ask Accountant."

i.     The foregoing charges on MLHG's account/debit or credit card do not reflect all improper charges by Beck which so far appear to include at least:

1.     About 31 Amazon.com charges including 5 Amazon video charges between April and July 2017, and an Amazon Prime membership charge in March 2017;

2.     At least 5 restaurant charges including 4 at a sushi restaurant, Amber 80 near Beck's apartment;

3.     29 iTunes charges between March and August 2017;

4.     A March 2017 Apple store charge;

5.     16 Duane Reade charges between 2/2017 and 5/2017;

6.     5 Eli Zabar charges between 3/2017 and 5/2017;

7.     27 Hamilton Valet charges between 3/2017 and 8/2017;

8.     A number of Manhattan hotel and motel room charges;

9.     78 charges between 1/2017 and 8/2017 paid to iPark 47, a parking garage on East 47th Street;

10.     5 Netflix charges between 3/2017 and 7/2017;

11.     11 Beck personal Visa charges between 2/2017 and 4/2017;

12.     28 charges at Target between 3/2017 and 6/2017;

13.     Countless Uber and Lyft charges (which means, if all those were for MLHG business, there should be no parking or auto charges); and

14.     7 payments to Weinstein between 1/2017 and 5/2017:

$575.00 on 1/13/17;
$2,525.00 on 1/30/17;
$875.00 on 2/8/17;
$775.00 on 2/28/17;
$1,525.00 on 3/28/17;
$1,550 on 4/4/17; and
$1,550 on 5/31/17;

j.     Beck caused MLHG to make payments to By David so that Beck could pay from the By David bank accounts monies for Beck's personal expenses; examples include:

1.     Cash withdrawal on 12/29/16;

2.     Payments to Barneys NY of $2,313.74 on 12/27/16 and $4.934.62 on 12/22/16;

3.     Cash withdrawals on 12/22/16 of $504.00 and $1,500.00;

4.     Two rent payments for Beck's personal residence of $6,072.00 on 12/13/16; and

5.     Payments to The Mansion Restaurant and to Hamilton Valet.

k.     Including the diversions of funds referred to in clause (e) above, Beck misappropriated at least $250,828.81 from MLHG, all for someone who was to have no salary or other compensation from MLHG.

49.     A review of MLHG's incomplete books and records shows that in 2016:

a.     Beck misappropriated and caused MLHG to pay approximately $2,427.04 for Beck's and his family's personal groceries;

b.      Beck misappropriated and caused MLHG to pay approximately $7,903.44 for Beck's and his family's personal laundry and dry cleaning;

c.      Beck misappropriated and caused MLHG to pay approximately $54,568.28 for Beck's and his family's personal shopping and grooming;

d.      Beck misappropriated and caused MLHG to pay approximately $4,247.23 for Beck's and his family's personal electronics;

e.      Beck misappropriated and caused MLHG to pay approximately $11,883.94 for Beck's and his family's personal entertainment and social media;

f.      Beck misappropriated and caused MLHG to pay approximately $31,131.79 for Beck's and his family's other personal expenses or for direct payments to Beck;

g.      Beck misappropriated and caused MLHG to pay approximately $12,267.01 for Beck's and his family's personal meals/restaurants;

h.      Beck misappropriated and caused MLHG to pay approximately $8,996.72 for Beck's and his family's personal parking/garage;

i.      Beck misappropriated and caused MLHG to pay approximately $72,563.47 for Beck's and his family's personal miscellaneous expenses or for direct payments to Beck for his personal use; and

j.      Beck misappropriated and caused MLHG to pay approximately $6,419.91 for Beck's and his family's personal transportation such as taxis, Lyfts and Ubers.

50.      It appears from a By David general ledger that Weinstein sent to MLHG's internal bookkeeper/accountant on January 20, 2017, that By David had about $1,370,399.84 in 2016 credits and debits, all or nearly all of which had to represent funds Beck diverted from MLHG to By David since By David's staffing services to third party customers were fairly limited in scope and revenues.

51.     By using MLHG funds and By David funds as Beck's personal piggy bank, (a) the corporate veil of By David must be pierced to its owner, Beck, and (b) Beck is the alter ego of By David, so that any liability of By David is also the liability of Beck personally.  By David was under-capitalized or not capitalized, and Beck's diversion of By David funds for Beck's personal expenses shows that Beck disregarded the legal existence of By David separate and apart from Beck personally.

52.     Beck is the controlling principal in the companies By David and Opal.

53.     Beck exercised complete dominance over By David and Opal.

54.     Beck caused By David and MLHG to unlawfully comingle their funds with each other's funds and with Beck's personal funds.

55.     Beck comingled his own funds with those of By David and Opal, and used those funds for Beck's and his family's personal expenditures as described in this Complaint.

56.     Beck abused the privileges of doing business in the corporate form to perpetrate injustices upon MLHG and Potentis.

57.     Beck utilized his control over By David and Opal to commit the wrongs and injustices described in this Complaint that caused injuries and damage to MLHG and to Potentis.

58.     Beck is the alter ego of each of By David and Opal.

59.     Beck must be personally liable to MLHG for all MLHG funds misappropriated by Beck, whether paid to Beck, to vendors for personal Beck charges, or to By David or Opal.

60.     Beck had By David take a $68,750.00 loan bearing interest at the rate of 1.5% per annum from Square Inc. on or about 9/15/16 and Beck linked that loan to MLHG's account with Square Inc.  Beck had payments made by MLHG to Square Inc. for that loan to By David.  The loan

from Square Inc. of $68,750.00 was paid in full on 4/19/17 with MLHG funds.  Beck is liable to repay this $68,750.00 to MLHG.

61.     Beck attempted to obtain another loan from Square Inc. on or about March 15, 2017 for MLHG or for By David and was rejected by Square Inc. because "A review of your account indicating recent uncharacteristic payment card processing activity."

62.     Beck caused the MLHG account with Square Inc. to be listed with Beck's personal name and personal Social Security number attached to that MLHG account.

63.     Beck improperly co-mingled MLHG's and By David's accounts with Square Inc.

64.     Beck co-mingled those MLHG and By David Square Inc. accounts solely to benefit Beck and By David.

65.     Beck caused the MLHG account with Square Inc. to be listed with Beck's personal name and Social Security number to hide or obfuscate By David's loan and other transactions with Square Inc. so as to confuse anyone looking at MLHG's books and records and as part of Beck's and Weinstein's scheme to allow Beck to divert and misappropriate MLHG funds to Beck's personal use.

66.     Potentis attempted to learn the truth from Beck about the Square Inc. transactions. On June 2, 2017, an internal Potentis emails stated:  "David [Beck] and I just spoke – like pulling teeth!  David also said he did not know how Square pulled BY DAVID funds from MLHG Regions account – there are no authorizations for this.  He also said he would reimburse MLHG for the funds (but he also said he asked Square to reimburse the funds and stick to the repayment plan) – so I am not sure which is true."

67.     It appears that Beck's transactions described in this Complaint were done to hide from Downtown as well as from MLHG, the MLHG Members and potential investors such as

Potentis the true state of MLHG's financial and business affairs which were severely negative and fraudulent.  Beck's purpose in doing that, aside from and in addition to Beck misappropriating funds from MLHG, was to show Downtown that MLHG's financial condition and operations were in the black and not the red, and that no fraudulent transactions were occurring at MLHG, so as to preclude Downtown from terminating the Management Agreement.

68.     By adding one or more unnecessary intermediaries in MLHG transactions, and by having no internal controls within MLHG's accounting department, Beck and Weinstein (a) made MLHG less transparent, (b) made it easier for Beck to hide MLHG's financial condition from MLHG's other Members and from potential investors, including Potentis, and (c) disguised the fact that the amount of money Beck sent to MLHG accounts was materially less than the amount of money Beck diverted to Beck personally and to bank accounts for Beck's other companies, money to which MLHG alone was entitled.

69.     Beck caused By David to make payments back to MLHG at various times and in various amounts, the total of which was materially less than the amounts Beck caused MLHG to pay to Beck personally and to By David.

70.     Beck had unfettered access to MLHG's funds so adding one or more unnecessary intermediaries in MLHG transactions also allowed Beck to divert MLHG funds before they were properly accounted for on MLHG's books and records and before they were received by MLHG. This allowed Beck to conceal from MLHG Members and from potential investors such as Potentis the fact that Beck was siphoning money from MLHG for his own personal use.

71.     Beck misappropriated to himself and his companies MLHG's funds in direct contravention of Paragraph 5.9 of the Operating Agreement.

72.     Beck's and Weinstein's creation of the Creative DBA for MLHG and the CC Agreements were intended to and did conceal from MLHG Members and potential investors such as Potentis the personal enrichment of Beck in contravention of Paragraph 5.9 of the MLHG Operating Agreement.

73.     Beck and Weinstein set up a system where MLHG's cash registers recorded cash sales at its food and beverage location at the Property but Beck had that cash placed in a safe on MLHG's premises and not deposited in MLHG bank accounts.   The cash has essentially disappeared.  Beck had sole or primary access to that safe.

74.     When Weinstein and Beck gave sales figures to Potentis, those cash sales were included in MLHG's sales revenues but the cash in the safe was excluded from MLHG's balance sheet.

75.     When Weinstein and Beck reported MLHG revenue to tax authorities, they omitted all or substantially all of MLHG's cash revenue.

76.     That scheme was intentionally designed by Beck and Weinstein to cause less sales tax to be paid to New York State and more cash to be retained by MLHG in its safe or otherwise, which cash was misappropriated by Beck as described in this Complaint, which misappropriation was concealed by them from Potentis and MLHG's other Members, as well as from tax authorities.

77.     Through the use of this scheme and other schemes, including omitting many accounts payable to vendors from MLHG's statements of expenses and balance sheets, and including the booking of future events for MLHG that Beck diverted to other venues such that MLHG received no revenues from those diverted events, or for which Beck personally received payments, Beck and Weinstein (a) made sure that MLHG's financial statements and financial books and records were

intentionally false and misleading, and (b) ensured that neither MLHG nor Potentis nor any other potential investor nor MLHG's other Members could accurately assess MLHG's financial condition.

78.     At the time of its investment in MLHG, Potentis:

a.      expected Beck to remain as MLHG's Manager and expected to rely on the continued management of MLHG by Beck as Manager of MLHG;

b.      expected to rely on Beck's efforts as MLHG's Manager;

c.      expected its investment to be dependent on Beck's efforts;

d.      anticipated that if the opportunity became available, Potentis could cause one of its partly-owned subsidiaries that is in the business of operating certain branded fitness centers in Manhattan to operate the fitness center at the 180 Maiden Lane Property as is set forth in Paragraph 8 of the Acquisition Agreement;

e.      was unaware that Beck had bartered about $800.00/month in cleaning services to the fitness center operator at the Property, Maidenfit LLC, a New York limited liability company DBA "CHAISEFITNESS" ("Maidenfit"), for complimentary classes for Beck's wife that Beck valued at $500.00/month;

f.      did not expect that MLHG's business operations and financial condition were so misrepresented and so mismanaged or that the Creative transactions were entered into to provide a disguise for Beck to take a salary or for By David to provide the event staffing in contravention of the Operating Agreement;

g.      did not expect that Beck had paid himself a salary at the rate of $125,000/year in contravention of the Operating Agreement;

h.      did not know or expect that Beck had engaged in a widespread scheme over a number of years to divert MLHG funds to himself and to By David, or that Weinstein was the architect of

MLHG's false books and records or schemes to divert cash from MLHG or to cause By David's funds, Beck's funds, and MLHG's funds to be comingled;

      i.     did not expect any need to involve itself in the management of MLHG; and

      j.     did not expect MLHG's sales tax returns, discussed in this Complaint, to have been falsified such that funds would be needed from Potentis to pay the correct amount of sales tax to New York State.

79.     To date, Potentis has invested approximately $2,200,000.00 in MLHG, all based on Beck's and Weinstein's frauds and false and misleading representations.  But for the frauds and misrepresentations committed by Defendants, that amount of Potentis's investment was not needed by MLHG.

**Weinstein:**

80.     Beck hired Weinstein and continued to engage Weinstein as MLHG's external accountant and CPA since the inception of MLHG until in or about August 2017.

81.     Weinstein is a blood relative to Beck, and is believed to be Beck's uncle.

82.     Weinstein made the false and misleading statements to Potentis and the misrepresentations to Potentis that are described in this Complaint prior to Potentis investing in MLHG securities and prior to Potentis executing and delivering the MLHG Operating Agreement.

83.     The Operating Agreement was an investment contract pursuant to which Potentis relied on for Beck to manage MLHG and to apply Potentis's invested funds in a manner consistent with Weinstein's and Beck's representations that the $200,000.00 cash part of the $300,000.00 to be invested by Potentis would wipe out all of MLHG's debts to vendors and others, and would cause MLHG to be self-funding, cash flow positive and profitable.

84.     MLHG paid Weinstein at least $20,000.00 during his tenure as MLHG's external accountant; a monthly retainer of $1,500.00/month plus money for additional services.

85.     Being MLHG's external accountant and a New York-licensed CPA, and the person who set up all of MLHG's books and records, systems, internal controls (or intentional lack of controls) and financial and tax reporting, and for the other reasons stated above, Weinstein was a fiduciary to MLHG in that:

a.     MLHG reposed trust or confidence in the integrity or fidelity of Weinstein;

b.     Weinstein set up three sets of books for MLHG, described below, and created MLHG's scheme to divert and hide MLHG's cash receipts from the federal tax authorities, from the New York State and New York City sales and income tax authorities, and from MLHG's members, including actual and potential investors such as Potentis.

c.     Weinstein directed MLHG's internal accountant/bookkeeper to do this cash and other fraudulent record keeping schemes, all of which went far beyond regular and normal accounting, tax and bookkeeping advice typically rendered by an accountant or a CPA to a client; and

d.     Weinstein in these capacities had a superiority of influence or assumed control and responsibility over MLHG.

86.     Weinstein breached his fiduciary and other duties to MLHG by participating in the frauds described in this Complaint.

87.     Weinstein's actions and omissions regarding MLHG and MLHG's books and records amounted to an active fraud perpetrated on the federal tax authorities, on the New York State and New York City sales and income tax authorities, and on MLHG's Members, including actual and potential investors such as Potentis, causing loss to MLHG and to Potentis.

88.     Weinstein (a) had actual knowledge of the illegal acts described in this Complaint, (b) helped set up or was the architect of setting up the schemes to conceal MLHG cash transactions and Beck's diversion of MLHG funds, and Beck's co-mingling of MLHG funds with Beck's personal funds and By David funds, and (c) concealed and helped Beck conceal these fraudulent schemes from the federal tax authorities, from the New York State and New York City sales and income tax authorities, and from MLHG's Members, including actual and potential investors such as Potentis.

89.     Weinstein did that concealment by knowingly and intentionally creating and issuing false MLHG books and records, false financial statements, false tax returns and false tax information statements such as on Forms K-1 issued to MLHG Members.

90.     Weinstein was also and may still be Beck's personal accountant and the accountant for By David and Opal.  Weinstein had a conflict of interest in acting for all of Beck, MLHG, By David and Opal, and that conflict either was not waivable or was not waived by MLHG, and Weinstein never withdrew from acting for and on behalf of MLHG.

91.      Weinstein was aware that the false MLHG financial books and records and false tax returns were to be used for a particular purpose or purposes, in the furtherance of which Weinstein knew and intended the recipients thereof to rely, and Weinstein knew the tax authorities and Members of MLHG and potential investors of MLHG such as Potentis would rely.

92.     Even if Weinstein might arguably not be a fiduciary to MLHG, Weinstein's actions in creating the scheme to hide MLHG's cash transactions from the tax authorities and from MLHG Members and potential investors such as Potentis, was reckless, highly unreasonable, represented an extreme departure from the standards of ordinary care, and amounted to Weinstein's actual intent to aid in the frauds being perpetrated by Beck and By David.  This amounted to active fraud in that Weinstein created and perpetuated these schemes, and actively aided and abetted these fraudulent

schemes, and is not fraud by hindsight.  Weinstein was an active participant in creating and perpetuating, and in aiding and abetting, Beck's frauds committed against MLHG, MLHG's Members and potential investors such as Potentis, and against the federal, New York State and New York City tax authorities.

93.     Weinstein created or helped Beck set up at least three sets of books on QuickBooks for MLHG, helped Beck create the transactions with Creative (as described in this Complaint) that benefitted Beck and By David and did not benefit MLHG, and by meeting with representatives of Potentis, was an active participant in Beck's frauds to induce Potentis to purchase MLHG securities and to induce Potentis to execute and deliver the Operating Agreement as an investment contract, as described in this Complaint.

**Creative:**

94.     Creative was incorporated in New York on February 12, 2009, and the New York Department of State shows its principal executive office at 3537 36th Street, Suite 431, Astoria, New York 11106.

95.     Creative's website is http://www.creativeconceptsnyc.com/# and shows Creative's principals as Miguel Urrego as Executive Chef and Julie Sommers as Director of Catering and Creative's office at 380 Lexington Avenue, 17th floor, New York 10168 and also at 36-46 37th Street, Long Island City, NY 11101.

96.     The CC Agreements:

a.     provided that for a term ending on 7-15-18, MLHG appointed Creative to act as "MLHG's exclusive Manager, representative and advisor in all matters related to in house and of premises catering . . . including, marketing, business generation, bill, execution of events, transportation, follow ups, in coordination with [MLHG].";

b.      provided that Creative would share 50% of the operating profit of the "Catering division" and in losses;

c.      provided that Beck would receive a salary of $125,000/year to be paid by the "Catering Division;"

d.      provided that By David would provide the event staffing;

e.      created a general partnership between MLHG and Creative to run until June 30, 2018, to operate "the Catering division" at MLHG's premises at the Property; and

f.      provided that each partner in that general partnership – meaning MLHG and Creative -- was to contribute $150,000 plus (1) MLHG would provide its physical space at the Property to this partnership, and (2) each partner would transfer all "existing bookings, deposits and contracts, bookings and future events to the partnership."

97.      It is not clear if the CC Agreements were manually signed or if they were oral agreements.

98.      The CC Agreements were at least partly performed in that:

a.      Beck caused MLHG DBA Creative Concepts NYC to pay Beck a salary at the rate of $125,000/year as provided in the CC Agreements; and

b.      MLHG funded payroll to Miguel Urrego and Julie Sommers of Creative, as well as funded payments to Creative's vendors including funding Creative's new offices.

99.      It appears that MLHG derived no benefits from the CC Agreements and incurred additional operating losses that were subsequently funded by Potentis.  Beck stated in a 9/16/16 email to Weinstein and others that "They [MLHG DBA Creative Concepts NYC] depleted our working capital."

100.    To the extent By David provided event staffing, those were corporate opportunities belonging to MLHG that Beck diverted to By David.  Beck and By David appear to be the only persons who benefitted from the CC Agreements other than and in addition to Creative's principals.

101.    At Weinstein's and Beck's direction Okin Edelman filed a doing business certificate with the New York Secretary of State on August 16, 2016 for MLHG doing business as "Creative Concepts NYC."  That DBA allowed Creative to become, or to appear to become, the alter ego of MLHG, or for MLHG to become the alter ego of Creative, at what was ultimately a substantial financial loss for MLHG.

102.    Pursuant to the CC Agreements, (a) Beck essentially abdicated his role as Manager to Creative which was not permitted under the Operating Agreement, (b) Beck was to receive an annual salary at the rate of $125,000 which was also not permitted under the Operating Agreement, and (c) By David was to provide event staffing which were services MLHG could provide and therefore was a corporate opportunity diverted by Beck away from MLHG.  MLHG itself could have provided staffing for its events including those of MLHG DBA Creative Concepts NYC.

103.    Beck's and Weinstein's motivation behind this nonsensical (for MLHG) Creative deal and the CC Agreements was for Beck to circumvent Paragraph 5.9 of the Operating Agreement, to provide Beck with a salary at the rate of $125,000/year, and to allow By David to provide event staffing to the exclusion of MLHG, all to turn MLHG into a vehicle for Beck to enrich himself at the expense of MLHG, MLHG's other Members, and potential investors such as Potentis.

104.    Creative and Beck prepared the document attached as Exhibit A to this Complaint to lay out the MLHG DBA Creative Concepts NYC business plan (the "CC Plan").  The CC Plan shows Beck as one of the individuals to receive a salary and By David to provide event staffing, all in contravention of the Operating Agreement.

105.    Between September 8, 2016 and October 27, 2016, at least $148,848.98 in funds from MLHG DBA Creative Concepts NYC was spent by MLHG, including payments to Creative principals and employees.

106.    The CC Agreements made no business sense for MLHG and were never accurately or fully disclosed to Potentis before Potentis made its investment in MLHG.

**Zbrella and Beck attempt to spoliate evidence by destroying or deleting emails and by destroying or altering MLHG financial data:**

107.    Beck hired Zbrella and continued to engage Zbrella as MLHG's external information technology ("IT") and Internet Service Provider ("ISP") through which MLHG's emails, financial data and website were operated, stored and controlled from on or about the inception of MLHG to in or about November 2017.

108.    Zbrella used Intermedia.net, Inc. ("Intermedia") to host MLHG's emails, with Zbrella being the interface between Intermedia and MLHG.  Intermedia was and is MLHG's email hosting company and was used by Zbrella for that purpose for MLHG.

109.    Beck directed Intermedia and Zbrella in writing to delete all of Beck's emails from MLHG's servers.  Beck notified Intermedia in an email dated August 15, 2017 that he as President of MLHG "release intermedia [sic] from any liability and understand that deleting my email is not a reversible process.  Please confirm and let me know when this is complete."

110.    Intermedia apparently did not abide by Beck's request.

111.    Beck was no longer MLHG's Manager on or after August 8, 2017.

112.    Despite MLHG being Zbrella's client, Zbrella allowed Beck to personally control MLHG's IT and ISP, all to further aid and abet Beck's fraudulent conduct alleged in this Complaint.

113.    On Beck's instruction, Zbrella purposefully refused to acknowledge (a) the change in MLHG's Manager to include Herfield as a MLHG Manager and (b) Beck's removal as Manager on August 8, 2017.

114.    Despite repeated requests made to Zbrella and its counsel verbally and in writing, Zbrella failed to give anyone else at MLHG any of the passwords or other access to or control over the MLHG servers containing MLHG's financial information and emails.

115.    Zbrella's purpose in this refusal was to give Beck time to continue to control MLHG's financial data and emails and to alter or destroy the same at the sole will of Beck.

116.    Zbrella was sent a "litigation hold" letter on both August 16, 2017 by email and on or about August 17, 2017 by letter, and nevertheless continued to aid and abet Beck's attempts to destroy and delete financial data and emails on MLHG's servers.

117.    On or about August 17, 2017, Beck or someone acting on Beck's behalf gained access or attempted to gain access remotely via an external (to MLHG) computer, to MLHG's financial and accounting data for the purpose of destroying or altering MLHG's financial data.

118.    On or about August 17, 2017, the MLHG accounting computer seemed to be having access and other issues.

119.    Upon investigation on or about August 17, 2017, a computer expert obtained access to the MLHG accounting computer as an administrator via a backdoor that this computer expert was able to work out.

120.    That computer expert determined that someone may have been attempting to delete or alter MLHG accounting files.

121.    Because that computer expert was able to backdoor a way into the MLHG servers, that computer expert was able to copy and preserve all then-existing MLHG computer files, both accounting and emails.

122.    It was not known to the computer expert or anyone else at MLHG, however, whether files had been deleted but it was clear that someone had been attempting to access the MLHG servers/data/accounting files/emails.

123.    Zbrella aided and abetted Beck, whether individually or as part of a conspiracy with others, without authorization or in excess of Zbrella's authorization, in Beck's attempts to delete Beck's emails on the MLHG servers and by refusing to give anyone else at MLHG access to or control over MLHG's emails,

124.    Beck wiped the hard drive on Beck's PC at MLHG's office and did so after he was removed as Manager of MLHG.

125.    Beck had personal control over all or substantially all of MLHG's employees' cellphones and other devices in that Beck put them on his personal Verizon account.  Despite requests to turn over those Verizon accounts to MLHG's control, Beck refused to do so and terminated the access of MLHG employees to their cellphones and other devices.

126.    With no authority to do so, Beck advised employees of MLHG in writing on August 11, 2017, after Beck had been removed as MLHG Manager, that: "I have disabled your cell phone and the mifi [MiFi is a brand name used to describe a wireless router that acts as a mobile Wi-Fi hotspot] device. . . I have disabled Scotts [sic] phone as well . . . .  All devices are on my personal Verizon [sic] portfolio."

127.    As described in this Complaint, Zbrella aided and abetted Beck's misappropriation of MLHG's common law service mark and trade name "Maiden Lane Events."

**Beck's and Weinstein's frauds unravel despite Zbrella's and Beck's attempts to conceal them:**

128.    Beck and Weinstein had to be confident that their fraudulent schemes would not be uncovered by Potentis or, if uncovered, would not be pursued by Potentis because Downtown has the right to terminate the Management Agreement if MLHG is found to have committed fraud. Without the Management Agreement, MLHG would not be able to use the Property and, absent finding another available comparable space, of which there are relatively few in Manhattan, there would be no MLHG.

129.    On March 10, 2017, Beck emailed Potentis that: "You have the expenses on paper and the projections to back up the loss.  We entered into qtr.1 with no reserve so operating on our cash flow was insufficient but no other choice.  Qtr. 2-3 and 4 are the stronger periods of our business with a primary focus on catering (cafeteria remains constant and it's a numbers game)  We need a push and that number was 200-260k.  We disclosed our payment plan and our AP [accounts payable] in good faith  We are behind the eight ball and I cancelled other deals for this based on our conversation and a cash influx this week."  Those statements by Beck were false and misleading if not outright fraudulent and were made to induce Potentis to purchase MLHG securities and to enter into the Operating Agreement as an investment contract wholly dependent on Beck's efforts as MLHG's sole Manager.

130.    Unbeknownst to Potentis, MLHG's internal accountant/bookkeeper emailed Weinstein on March 13, 2017, asking: "Can you use Maiden Lane [MLHG] operating account as Staffing by David is negative?"  Weinstein responded "I can and will."  Comingling of MLHG and By David funds was apparently a norm for Beck and Weinstein, a fact never disclosed to Potentis.

131.    On March 23, 2017, a Potentis representative emailed Beck to confirm the Acquisition Agreement had been executed by Potentis and "the remaining balance due under Section

1 [$175,000.00] has been wired."  Potentis welcomed Beck who on March 23, 2017 emailed Potentis representatives that he is "really looking forward to this partnership."

132.    On April 4, 2017, after sending 2017 projections to Potentis, which projections were false and misleading when made and delivered to Potentis, Beck emailed Potentis that the projections are "Not bad numbers, just need to get out of the current hole."

133.    On April 3, 2017, a Potentis representative emailed Beck: "I wanted to touch base with you about setting up a visit to your office to go over accounting and your current processes, preferably when your bookkeeper is there.  Could we set up a visit this week?"

134.    On April 10, 2017, a Potentis representative emailed Weinstein asking for a "Copy of the 2016 Trial Balance used to complete the 2016 tax returns . . . [and] Copy of the most recent Sales Tax returns . . .  I may have other items as we finish our review and will reach out to you if anything else is needed.  Thanks for your help."

135.    Because Weinstein did not provide the requested information, this Potentis representative sent a follow-up email to Weinstein on May 3, 2017 "to follow up on this request from April 10th."  On May 3, 2017, Weinstein sent an email to Potentis stating that: "The trial balance is on The MLHG computer.  It can be emailed to you by Lori [the internal MLHG accountant/bookkeeper]."

136.    While Potentis understood MLHG's books and records may have been disorganized, Potentis never expected that the reasons for the disorganized state of MLHG's books and records or the state of MLHG's financial condition were Beck's and Weinstein's frauds, Beck's diversion of MLHG cash and other funds, and MLHG's many concealed and undisclosed liabilities to third parties.

137.    On April 12, 2017, the MLHG internal bookkeeper/accountant emailed a Potentis representative that: "Staffing by David was zeroed out against guaranteed payments to David [Beck] as of 12/31/16.  It has not been zeroed in the new quick books as I am waiting for the final entries for the old company to enter the opening balances as of 1/1/17 in the new quick books.  The only activity that will be remaining in the Staffing by David account after the books are brought up to date is payment made by Staffing by David to a Maiden Lane Hospitality vendor (Party Rental) for $16,041.96 less a credit card deposit that was Maiden Lane Hospitality's but was deposited in Staffing by David of $5,428.35."

138.    On March 8, 2017, the MLHG internal bookkeeper/accountant emailed Weinstein, who obviously knew about if not engineered the comingling of By David and MLHG funds: "On Staffing by David, there are 3 payments made in December [2016] that were for Party Rental that were not reflected on Maiden Lane books 12/20 $9999.99   12/20  $2987.75   12/22  $3054.22 Therefore the Staffing by David write off should have included these.  I will adjust as of 1/1 in Maiden Lane but I do not know what you have these checks posted as in Staffing by David."

139.    On April 20, 2017, Beck emailed Potentis that: "Confirmation on the cash locked in safe going forward. . . will send sheets of daily/weekly cash."

140.    Potentis discovered and reported internally in an email dated May 1, 2017 that MLHG "is a big mess.  The books are unreliable so this is going to be a challenge.  Lori [the MLHG bookkeeper/internal accountant] has only been there since December [2016] and had to back into numbers to get any sort of records done."

141.    On May 2, 2017, an internal Potentis email reported that: "I doubt there is any detail/backup for the ATM [automated teller machine] purchases.  There are no procedures in place and details/receipts were not always provided to Lori."

142.     On May 3, 2017, a Potentis representative learned about another undisclosed MLHG liability that Beck knew about since on or before March 23, 2017 but did not disclose to Potentis. That liability was the settlement of a lawsuit, also not disclosed to Potentis, that, according to Beck's May 3, 2017 email to a Potentis representative, "is for a printer that my ex-partner brought down to 180 MAIDEN from a restaurant whom he had a partnership with Juniors Cheesecake and put it into MLHG name unbeknownst to me.  It was brought to my attention in April that there is an outstanding balance due for the lease and they came after Juniors and us.  (this printer was sitting in storage for the longest time until a few months back when the office asked me if they can use it – it was forgotten about until someone found it)  Juniors it seems paid the interest after some back and forth negotiation and being that my ex-partner signed the lease to MLHG we are now liable."  Beck had been negotiating to settle the lawsuit during March and April 2017 yet never disclosed anything about that lawsuit to Potentis until May 3, 2017.

143.     On May 4, 2017 Beck emailed Potentis that insurance premiums "have not been paid in 3 months."  Beck noted sales tax was also due.  However, Beck did not reveal the full extent of the MLHG sales tax liability at that time because on July 10, 2017, MLHG received another letter from New York Sales Tax "regarding the delinquent payroll and sales tax from November 30, 2016."

144.     Beck also on May 4, 2017 told Potentis in an email that he, Beck, would have a new "events model" to determine event pricing and profitability "tomorrow."  Potentis wanted MLHG to put in place a pricing model in order to create internal financial controls at MLHG and to make MLHG more accountable for its own activities, profitability and cash flow.  That no doubt interfered with Beck's and Weinstein's schemes to divert MLHG cash and receivables from customers and from MLHG to Beck and to By David.  No events model was ever delivered by Beck to Potentis.

145.    Potentis, through a subsidiary, MedAffect LLC, which provides administrative services to Potentis and companies Potentis invests in, became actively involved on or about May 5, 2017 in MLHG's cash reporting and in making sure MLHG's cash was deposited into a MLHG bank account.

146.    As of May 15, 2017, Potentis's investment in capital contributions, services and loans had increased to a total of about $353,416.14 due to ever-increasing undisclosed liabilities surfacing that needed to be paid in order to keep MLHG's doors open and to preserve MLHG's Management Agreement with Downtown.

147.    On May 15, 2017, Beck emailed Potentis representatives about MLHG's potential 2017 revenues: "I THINK WE COULD DO A TAD OVER 2 MILL. . . IF WE GO OVER EVEN BETER."  That projection by Beck was false and misleading.

148.    On May 17, 2017 Beck emailed Potentis representatives that the event staffing for a 21 Club event would be half by MLHG and half by an outside provider, Cutting Edge.

149.    On May 18, 2017, Beck emailed his internal team at MLHG, without including anyone from Potentis on the email, stating: "Gents Please send me the cash in safe total and all expenses that were paid out.  Please break out the expense with who gave who permission to take cash for reimbursable and expenses."  On May 19, 2017, Beck emailed the same team: I may have asked this 4x's now guys.  Once in an email yesterday and twice verbally yesterday and now once more in an email.  Please send."

150.    On May 22, 2017, it appeared that the MLHG internal accountant/bookkeeper was inexplicably having difficulty logging into MLHG's QuickBooks files on MLHG's servers.

151.    Potentis emailed Beck on May 24, 2017 asking Beck to send all checks received by MLHG directly to MedAffect LLC for deposit into a MLHG bank account.

152.     On May 30, 2017, Weinstein responded to Potentis representatives inquiring about Weinstein's accounting work for MLHG that he, Weinstein would only take instruction from Beck. Weinstein emailed Potentis on May 31, 2017 that "When I see the new revised management agreement with you as managing partner I will accept the new policy."  Herfield emailed Weinstein on May 31, 2017: "please see email chain below.  As per the operating agreement we constitute 80% and can make all decisions.  Since I [Potentis] am funding the company [MLHG], please confirm that David [Beck alone] is no longer in charge of approving charges and all spending must be approved by me."

153.     On May 31, 2017, Beck emailed Potentis and the other MLHG Members that he needs compensation that Beck claimed was due to him from MLHG, of course without mentioning that Beck had been helping himself to MLHG funds for quite some time.  Beck mislead all on that email by saying that the catering and events division "has kept us [MLHG] afloat since inception of MLHG @ 180 MAIDEN LANE.  After Smiths [sic] departure, I had assumed all management operations of MLHG and I note that at the time of his departure the company was heavily in debt which I erased substantially from the catering and events that I personally produced for the MLHG catering division.  On a further note all those events were profitable and to date all amounts due to me for 2017 events remain unpaid."

154.     Beck's statements in his May 31, 2017 email beg the question why MLHG needed cash infusions from Potentis even beyond the original Potentis $300,000.00 investment if MLHG was "profitable."  It appeared that having internal controls being put in place by Potentis and by imposing on MLHG accountability for MLHG's cash, checks and events, meant that Beck's ability to steal from MLHG had become more difficult.

155.    This could explain why Beck resorted to having Downtown or an affiliate of Downtown (DC Services NY LLC) wire $19,602.27 on July 21, 2017 and $25,000 on July 7, 2017, totaling $44,602.27) directly to Beck's personal retirement account at Capital One Bank at Beck's direction when Beck had no authority to direct Downtown or its affiliate to do that.  Beck relied on his personal relationship with Downtown's manager to accomplish that funds diversion.  Beck did not involve Herfield in that direction to DC Services NY LLC and concealed that from Herfield.  That $44,603.27 belonged to MLHG.  Beck thereby converted, or stole, those funds from MLHG.

156.    To add insult to injury, in August 2017 MLHG was still stuck paying bills for the DC Services June 2017 event at the Property.  An August 3, 2017 internal email stated: "Currently, accounting has invoices from the building [DC Services] event in June [2017], where partial payments were made."  Potentis was unaware that Beck had diverted the remaining payments due to MLHG from DC Services to himself.

157.    On June 2, 2017, Potentis attempted to learn the truth from Beck about MLHG's transactions with Square Inc. because Square Inc. was taking or holding MLHG funds transacted through Square Inc. and not remitting those funds to MLHG.  On June 2, 2017, an internal Potentis email stated:  "David [Beck] and I just spoke – like pulling teeth! . . .David also said he did not know how Square pulled BY DAVID funds from MLHG Regions account – there are no authorizations for this.  He also said he would reimburse MLHG for the funds (but he also said he asked Square to reimburse the funds and stick to the repayment plan) – so I am not sure which is true."  In another June 2, 2017 email from Beck to a Potentis representative, Beck said "I am trying to get to the bottom of this immediately with them [Square Inc.] too" even though Beck knew and did not disclose to Potentis what Beck had done which was use MLHG funds to pay off a Square Inc. loan to By David.

158.    Square Inc. would not have taken or held MLHG funds without Beck's prior authorization on behalf of MLHG, a fact Beck never disclosed to Potentis, especially since MLHG funds, received from Potentis, were used by Beck to pay off a loan Square Inc. made to By David.

159.    It appears from the 2016 By David general ledger that Weinstein sent to MLHG's internal bookkeeper/accountant on January 20, 2017, that By David had about $1,370,399.84 in 2016 credits and debits, all or nearly all of which had to represent funds Beck diverted from MLHG to By David since By David's staffing services were fairly limited in scope and revenues.  This By David general ledger was not disclosed to Potentis and was found in 2018 during a review of MLHG's emails.

160.    On June 14, 2017, MLHG's Windstream telephone service was disconnected for non-payment and no one other than Beck had any access to the telephone accounts.  No one at MLHG or Potentis knew that only Beck had online and other access to this MLHG telephone account with Windstream.

161.    By June 2017, Potentis loaned MLHG a further $180,000.00 to cover MLHG costs that resulted directly or indirectly from Beck's and Weinstein's diversion of MLHG cash and other funds, and from their other frauds, including: $25,000.00 on 6/1/17; $25,000.00 on 6/8/17; $15,000.00 on 6/15/17; $40,000.00 on 6/20/17; $40,000.00 on 6/23/17; and $35,000.00 on 6/29/17.

162.    In June 2017 Potentis hired Ari Malcom ("Malcom"), an experienced hospitality industry professional, to oversee its investment in MLHG.

163.    Potentis needed answers to why nothing at MLHG seemed to make sense.  Malcom began to notice irregularities and inconsistencies in the MLHG financial information Beck and Weinstein provided to Potentis regarding MLHG.

164.     Malcolm kept digging for accurate information.  The sorts of frauds Malcolm discovered, such as multiple sets of books, cash in the safe, and other schemes Malcolm uncovered, are set forth in this Complaint.

165.     On June 27, 2017, MLHG's payroll services provider emailed MLHG's internal bookkeeper/accountant that they had received a notice from the IRS of unpaid Q1 2017 taxes with the IRS demanding payment of an underpayment, with interest and penalties, of $12,845.22.

166.     On July 13, 2017, MLHG's internal bookkeeper/accountant emailed Potentis that "Today I [received] collection notice (attached) related to First Data Merchant Services which was way before my time.  This is the first time I am seeing this.  Also, a different collection agency called regarding a bounced payroll check from back in January [2017] . . . I want to confirm you saw this notice regarding then unfiled 2/28/17 sales tax return."

167.     A Potentis representative then asked for a revised accounts payable aging report and the email list the MLHG internal bookkeeper/accountant sent on July 13, 2017 included payables that Potentis had already paid a month earlier but were still showing on the MLHG accounts payable report.

168.     On July 13, 2017 MLHG received a notice from New York State that sales tax returns had not been filed for the period ended 2/28/17 and that New York State's estimate of MLHG's sales tax liability for that period was $27,814.67.

169.     On July 20, 2017, Downtown sent an email to Beck that Beck forwarded to a Potentis representative advising that a MLHG creditor – New York State -- had filed a tax lien against the Property for a MLHG debt.

170.     With all the diverted cash and other MLHG funds that Beck paid to himself and By David, and with all these MLHG unpaid, unaccrued and undisclosed debts and liabilities suddenly

coming to light, Beck said, in yet another lie to a Potentis representative: "The books are cleaner in 2017 as I wanted them kept a certain way for P&L viewing."

171. On August 7, 2017, Potentis identified about $11,031.00 in cash payments by MLHG to or for the benefit of Beck, including cash payments made on April 10, 2017. On August 8, 2017, Potentis asked the MLHG internal bookkeeper/accountant: "Doesn't all of the petty cash expenses still need to be recorded on the books?" The MLHG internal bookkeeper/accountant replied on August 8, 2017: "It is not my decision." The implication is clear that dealing with MLHG's cash was the decision of Beck and Weinstein, not the MLHG internal bookkeeper/accountant.

172. The truth about MLHG's cash position, need for funds to pay vendors and others, and MLHG's false and under-reported sales tax liability resulted in:

a.    Potentis expending additional funds to investigate those irregularities further;

b.    The requisite percentage of MLHG Members removing Beck as Manager of MLHG;

c.    Potentis being compelled to make additional cash investments in MLHG in order to keep MLHG afloat and to fulfill MLHG's obligations under the Management Agreement and to customers who had booked events at the Property out into the future, all resulting in damages and losses to Potentis of approximately $2,200,000.00 to date; and

d.    MLHG not being able to grow its business, market and sell more events, and become cash flow positive and profitable, as Beck and Weinstein had represented to Potentis would be the case if Potentis invested $300,000.000 in MLHG securities which Potentis did.

173. Potentis acted reasonably in relying on Weinstein's and Beck's false and misleading statements made to Potentis. Each of Potentis and MLHG trusted Weinstein and Beck not to make knowingly false and misleading statements to Potentis and not to defraud Potentis.

174.    Weinstein's and Beck's conduct was more than severely reckless – it was highly unreasonable and deliberate, if not outright unlawful and fraudulent.

175.    Each of Potentis and MLHG relied on, and was entitled to rely on, Beck being a faithful employee of MLHG and a faithful Manager of MLHG; Weinstein being a faithful and independent accountant and CPA for MLHG and not to have been the architect of the fraudulent schemes described in this Complaint; and for Beck and Weinstein not to mislead Potentis or any of MLHG's Members by creating multiple sets of books and records and by making false and misleading statements to induce Potentis to purchase MLHG securities and to have executed the Operating Agreement, and to have induced MLHG's Members to consent to that transaction.

176.    What is now known, and even that knowledge is still incomplete, under the systems and absence of internal controls set up by Beck and Weinstein, for Beck's personal benefit and to the detriment of MLHG and its investors such as Potentis:

a.     MLHG's cash transactions were not recorded on its books and records or sales tax and other tax returns;

b.     MLHG's cash was hidden in an on-premises safe to which Beck had the access and to which cash Beck helped himself;

c.     Despite a prohibition in the MLHG operating agreement on compensation being paid to Beck, Beck had MLHG pay Beck compensation at the rate of $125,000.00/year and Beck diverted MLHG cash and other funds to himself and to By David;

d.     MLHG sales tax returns were fabricated by Weinstein and Beck so that MLHG paid less sales tax to New York State and New York City in order to allow Beck to misappropriate more cash and other funds from MLHG;

f      Beck diverted nearly $45,000.00 in accounts receivables due to MLHG to Beck personally, diverted to himself at least $93,419.44 in MLHG cash over an 11 month period, and also misappropriated $103,451.78 of MLHG's other funds over a five month period to himself for Beck's and his family's personal cooperative apartment maintenance charges, groceries and sundries at Upper East Side stores such as Duane Reade and Key Food, charges at Upper East Side restaurants, personal car garage, personal valet/dry cleaning services, and personal pocket cash;

g      Beck caused all or nearly all of MLHG's accounts with vendors to be under his personal control rather than under MLHG's company control as part of Beck's scheme to allow no one other than Beck to have the ability to control MLHG's operations to have access to MLHG's books and records;

h.      Beck enlisted Zbrella to aid and abet Beck's frauds and to perpetuate Beck's personal control over MLHG's computer servers and email accounts and to change Beck's email signature to misappropriate MLHG's common law service mark and trade name "Maiden Lane Events";

i.      Beck used his personal bank accounts and the By David bank accounts to comingle his own funds and By David funds with MLHG's funds in order to make MLHG's books and records false and misleading and very difficult to analyze for accuracy.  That comingling scheme was perpetrated and continued by Weinstein;

j.      Beck used Opal to divert MLHG corporate opportunities to Opal; and

k.      Beck caused Creative to fold its operations in whole or in part into MLHG solely to allow Beck to pay himself a salary at the rate of $125,000/year when the MLHG operating agreement prohibited payment of any salary to Beck and to cause By David to provide event staffing when MLHG could provide its own event staffing.

177.    The Operating Agreement gave the Manager the "power to manage, operate and control the business and affairs of the Company."  Paragraph 5.4 of the Operating Agreement limited the Manager's authority by requiring that certain actions, including MLHG incurring debt in an amount greater than $10,000, or MLHG making any expenditure in excess of $10,000, be approved by 80% of MLHG's Members.

178.    Beck disregarded that 80% approval requirement by wiring more than $10,000 from MLHG's accounts to others including to himself and to By David on a number of occasions, and also by diverting payments due to MLHG from one or more third parties, including without limitation Downtown or an affiliate of Downtown, and in at least two cases in amounts more than $10,000, directly to Beck's personal bank accounts and to By David bank accounts.

179.    When a representative of MLHG, not Beck, emailed Downtown on July 27, 2017 to inquire about the balance due to MLHG from a Downtown June 2017 event at the Property held for real estate brokers, an event catered by MLHG, Downtown's representative said: "The broker event was paid for in full via multiple wire transfers that Beck requested and provided account numbers for.  Receipts attached of screenshots."  The merchant name on the wire that MLHG did receive is shown as "Maiden Lane Hospitality Gr" while the merchant name on the other two wires of $19,602.27 and $25,000 were shown as "MLH."

180.    Downtown or an affiliate of Downtown (DC Services NY LLC) wired $19,602.27 on July 21, 2017 and $25,000 on July 7, 2017, totaling $44,602.27, directly to Beck's personal retirement account at Capital One Bank at Beck's direction when Beck had no authority to direct Downtown or its affiliate to do that.  Beck did not involve Herfield as MLHG's other Manager in Beck's direction to DC Services NY LLC and concealed that from Herfield.  That $44,603.27 belonged to MLHG.  Beck thereby converted, or stole, those funds from MLHG.

181.    To add insult to injury, in August 2017 MLHG was still stuck paying bills for the

June 2017 DC Services event at the Property.  An August 3, 2017 internal MLHG email stated:

"Currently, accounting has invoices from the building [DC Services] event in June [2017], where

partial payments were made."

**Maidenfit:**

182.    What is also now known is that Beck arranged for MLHG at MLHG's own expense,

valued by Beck at $800.00/month, to provide cleaning services to Maidenfit in exchange for

discounted fitness classes for Beck's wife, Angela Beck.  Beck valued those cleaning services to

Maidenfit at $500.00/month.  Maidenfit confirmed this barter in an email exchange with Beck on

June 13, 2017.

183.    Beck never disclosed that barter transaction to MLHG's other Members, to Potentis

or to Herfield as MLHG's other Manager.  Likewise, none of them approved Beck's barter

transaction with Maidenfit.

184.    The diverted value from MLHG is $800.00/month for as long as Beck's wife (and/or

Beck) benefitted and may still be benefitting from these discounts.

185.    Maidenfit and MLHG are parties to a "Management Agreement" dated August 1,

2015 (the "Fitness Center Agreement").  Paragraph 7 of that Fitness Center Agreement states that

cleaning the fitness center facility is solely the responsibility of Maidenfit.  "All cleaning to be

performed by Service Provider [Maidenfit] pursuant to this Section 6 [sic – it is Section 7] shall be

undertaken at Service Provider's [Maidenfit's] sole expense, including the purchase of cleaning

supplies."

186.    Nothing in the Fitness Center Agreement contemplates or authorizes the barter transaction Beck did with Maidenfit.  MLHG did not benefit from that barter transaction.  Beck and his wife, and Maidenfit benefitted, not MLHG.

187.    Beck must account to MLHG and reimburse MLHG for the value of that barter transaction with Maidenfit.

188.    Paragraph 5.8 of the Operating Agreement makes the Manager (and all other Members of MLHG) liable to the other MLHG Members for his gross negligence, willful misconduct or fraud.

189.    Pursuant to Paragraph 5.9 of the Operating Agreement the Manager is not entitled to any salary or other compensation for services rendered to MLHG, but is entitled to (a) reimbursement of expenses and costs reasonably incurred in connection with MLHG's business and (b) "in consideration of David Beck's operation of the catering services for [MLHG], David Beck shall receive a guaranteed payment, that is equal to the greater of ten (10%) percent [sic] of gross catering contract price per catered event performed by [MLHG] or the amount of the administrative or service fee charged to such catering customer(as reflected in the subject catering contract) per catered event performed by [MLHG]."

190.    The amount of MLHG funds misappropriated by Beck, exceeded any amount due to Beck pursuant to Paragraph 5.9 of the Operating Agreement.

191.    By David was providing staffing for MLHG events.  That was done so that Beck could circumvent the Operating Agreement's prohibition on MLHG paying compensation to Beck, especially since MLHG itself could have provided staffing services for its events including MLHG DBA Creative Concepts NYC events.  There are no written records of the MLHG Members

approving this or any written contracts between MLHG and By David regarding staffing, or approving the CC Agreements which provided for event staffing to be done by By David

**Howard Hughes Corporation:**

192.    On June 1, 2017, while Beck was holding himself out to third parties as "President, Maiden Lane Hospitality Group and Maiden Lane Events," Beck sent an email to Maidenfit, the fitness center operator at the Property, stating that "I am working closely with the Sr. VP of the Howard Hughes Corporation ["Howard Hughes"] who have 80 employees at their NYC office.

193.    Beck had no reason to send that email to Maidenfit other than for Beck's personal benefit.  Beck did not copy or involve Herfield in Beck's communication to Maidenfit.

194.    In or about August 2017, and most likely before then, Beck was actively seeking employment as a Director of Events with Hughes.

195.    In or about August of 2017, while still purporting to serve as the Manager of MLHG, (a) Beck attempted to interfere with the Management Agreement by encouraging Downtown to cease doing business with MLHG, and (b) Beck encouraged Downtown to engage Howard Hughes to replace MLHG to operate MLHG's facilities at the 180 Maiden Lane Property.

196.    On August 11, 2017, Beck sent an e-mail to representatives of Howard Hughes and Downtown, in order that they "meet" each other virtually.  In that e-mail, Beck stated "both of you are aware of the conversations I am having with both parties."  Those "conversations" had to have occurred prior to August 11, 2017 and per the June 1, 2017 email Beck sent to Maidenfit, probably had been taking pace at least as early as June 2017.

197.    In an email Beck sent to Downtown on August 14, 2017 with his email signature as "President, Maiden Lane Hospitality Group and Maiden Lane Events," Beck introduced Howard

Hughes and Downtown to each other in an effort to replace MLHG with Howard Hughes at the Property.

198.     In that August 14, 2017 email Beck said: "I am trying to negotiate a buy out for them [presumably Potentis and the other Members of MLHG] where they walk away without a loss!"

199.     Beck never involved Herfield, the Manager of MLHG, in Beck's discussions with Downtown and Howard Hughes.

200.     On or about August 15, 2017, Beck attended a meeting with Howard Hughes at which he disclosed confidential and proprietary information belonging exclusively to MLHG.

201.     Beck in his earlier meetings and discussions with Downtown and Howard Hughes also had to have disclosed MLHG confidential and proprietary information.

202.     In an email on or about August 15, 2017, Beck thanked the Howard Hughes representatives for discussing a Director of Events job at Howard Hughes with him, and acknowledged his scheme to have Howard Hughes replace MLHG at the Property.

203.     Beck wrote that August 15, 2017 email to Andrew Schwartz, the Senior Vice President, Strategic Partnerships at The Howard Hughes Corporation, and said: "Thank you for taking the time today to learn more about what has transpired at 180 Maiden Lane over the past 2 years, what the future potentially holds there and the synergies both 180 ML [Maiden Lane] and HH [Howard Hughes] properties can do together if managed by one group.  Aside from 180 ML, I do want to thank you for meeting with me to discuss the Director of Events position that is available within your organization and explaining what the duties would be.  After reviewing the position and thinking about what I can do to grow the events division at the HHC [Howard Hughes Corporation], I would appreciate it if you can let me know what the next steps would be to secure the position. . . ."

204.     Beck had been meeting with Howard Hughes (a) not to benefit MLHG, (b) to benefit himself, (c) to interfere improperly with MLHG's business under the Management Agreement with Downtown, and (d) to interfere improperly with the Management Agreement itself.

205.     Beck was aware that at this same time Herfield as Manager of MLHG was in active discussions with Downtown on amending the Management Agreement for the benefit of MLHG.

206.     Beck's actions with Howard Hughes and Downtown were attempts to tortiously interfere with the Management Agreement.

207.     Beck was also aware that Potentis, had (and has) the financial wherewithal to allow MLHG to exploit the ongoing corporate opportunity that existed between MLHG and Downtown.

208.     Nonetheless, Beck continued to take actions intended to harm MLHG and to benefit himself, Howard Hughes, and Beck's newly formed company Opal, and to misappropriate to himself that corporate opportunity.

209.     Beck sent a text message on August 4, 2017 to a MLHG employee who apparently did know about Beck's discussions with Howard Hughes and Downtown in which Beck said: "Keep your mouth shut about what is happening .U should never of told josh what happened as it doesn't help anyone including MH [Matthew Herfield, the Manager of MLHG] or Ari [Ari Malcolm, by then the MLHG head of operations] . .If u leak anything to anyone in the bldg. u will get a legal letter  Please just trust me . . .U got joe g [the Downtown Property manager] in trouble as they didn't know anything and they questioned him and he had to backtrack  Stop worrying about your job and just worry about informing the bldg. of day to day ops."

210.     It is clear that (a) Beck sent this August 4, 2017 text message while Beck was a Manager of MLHG, (b) Beck did not involve Herfield, the other MLHG Manager, in Beck's discussions with Howard Hughes, and (c) without authority from MLHG's other Manager or

Members, Beck revealed MLHG confidential information, clearly competitive information, to Howard Hughes, for Beck's own benefit in Beck's attempt to secure a job with Howard Hughes and to attempt to have Howard Hughes replace MLHG at the Property, all to the detriment of MLHG and its Members, including Potentis.

211.    Paragraph 6.5 of the Operating Agreement says:  "David Beck shall be prohibited from participating for profit in any other catering businesses, for so long as this Company [MLHG] engages in the catering business at 180 Maiden Lane, New York NY and provided the Company [MLHG] can accommodate and perform the catering function which is the subject of an outside catering job, unless he [Beck] receives the express consent from the other two Day to Day manager to do so."

212.    Since the other two of the three Managers were no longer Managers, and Herfield was a Manager, Herfield's consent was needed for Beck to be employed by Howard Hughes and to divulge any MLHG confidential information to Howard Hughes.  Herfield never consented to Beck's employment with or competitive overtures to Howard Hughes or to Beck's revelation of MLHG confidential information to Howard Hughes.

213.    Beck's creation of the transactions with Creative and entering into the CC Agreements also violated Paragraph 6.5 of the Operating Agreement.

214.    All of this was compounded by Zbrella deleting or attempting to delete Beck's emails, including those relating to Beck's betrayal of MLHG in Beck's dealings with Howard Hughes and Downtown.

**Opal and MLHG trade name and event misappropriations:**

215.    Beck sent a contract dated March 2, 2018 to "New York Media" from "Maiden Lane Events/Opal Hospitality Group, located at 180 Maiden Lane."

216.     Opal is owned by Beck.  MLHG has no ownership interest in Opal.

217.     Beck routinely used the signature block on his emails from MLHG as "President, Maiden Lane Hospitality Group and Maiden Lane Events."

218.     Beck has misappropriated MLHG's trade name and common law service mark "Maiden Lane Events" from MLHG and is using it without permission of MLHG.  Beck and Opal are thereby and therefore misappropriating the goodwill of MLHG in its trade name and business and operations and association with Potentis.

219.     Beck used in interstate commerce on behalf of MLHG the MLHG trade name and common law service mark "Maiden Lane Events" in his email signature block as "President of MLHG and Maiden Lane Events."

220.     MLHG has maintained and used actively in interstate commerce the trade name and common law service mark "Maiden Lane Events" to promote its business and event services. MLHG has continuously used the trade name and common law service mark "Maiden Lane Events" to identify its goods and services and to distinguish them from those goods and services sold by others since at least MLHG's formation, including, without limitation, in emails, promotional materials and in communications with customers and prospective customers.

221.     "Maiden Lane Events" has as a result acquired considerable value and goodwill and has become well-known to consumers as identifying goods and services offered by MLHG and has developed a secondary meaning in the public mind in that customers have come to know and recognize "Maiden Lane Events" as identifying MLHG's goods and services.  "Maiden Lane Events" is highly distinctive of goods and services offered by MLHG.

222.     By David, Opal and Beck offer event services and goods in direct competition to MLHG.

223.     Beck's LinkedIn profile lists him as President of MLHG and By David and Opal, all offering the same products and services as are offered and sold by MLHG.

224.     Beck's, By David's and Opal's use of the trade name and common law service mark "Maiden Lane Events" is an attempt to confuse and divert MLHG's customers and prospective customers and to induce them to purchase Beck's, By David's and Opal's goods and services instead of MLHG's goods and services.

225.     Beck, By David and Opal are infringing the MLHG trade name and common law service mark "Maiden Lane Events" by using that exact same trade name and common law service mark without license or authorization.

226.     The public is likely to be confused, deceived, or otherwise manipulated by the unauthorized use by Beck, By David and Opal of MLHG's trade name and common law service mark.  Therefore, Beck's, By David's and Opal's willful use of the trade name and common law service mark "Maiden Lane Events" without right, license, or authorization constitutes common law trademark infringement.

227.     Beck, By David and Opal are diluting the value of the MLHG trade name and common law service mark "Maiden Lane Events" by using it without license or authorization and is thereby tarnishing, blurring, and diluting MLHG's reputation, goodwill, and trade name and common law service mark.

228.     Beck, By David and Opal are engaged in federal and common law unfair competition by causing consumer confusion as to the source and sponsorship of their goods and services.

229.     Beck's, By David's and Opal's improper conduct is willful, intentional, and in bad faith.

230.    It appears that with Herfield becoming a MLHG Manager and with Potentis discovering many of Beck's and Weinstein's frauds and financial irregularities in MLHG's books and records, Beck began to use "Maiden Lane Events" in his MLHG email signature block on or about May 30-31, 2017 knowing full well at that time that Beck intended to compete with MLHG and to do so by misappropriating MLHG's common law service mark and trade name "Maiden Lane Events."  To that end, Beck incorporated Opal on August 22, 2017 and caused Opal to use MLHG's common law service mark and trade name "Maiden Lane Events."

231.    Beck's, By David's and Opal's continued willful use of MLHG's trade name and common law service mark "Maiden Lane Events" being without right, license, or authorization, is likely to cause confusion and therefore constitutes unfair competition and infringement of MLHG's rights in that trade name under the Lanham Act, 15 U.S.C. §1125.

232.    MLHG has been substantially and irreparably injured by Beck's, By David's and Opal's conduct, and will continue to be substantially and irreparably injured unless and until they are permanently enjoined from infringing MLHG's trade name and common law service mark "Maiden Lane Events."

233.    Beck, By David and Opal obtained profits from their improper conduct and MLHG has sustained actual damages as a result of Beck's, By David's and Opal's willful infringement in an amount that has yet to be determined.

234.    Beck's, By David's and Opal's conduct has been intentional and willful, entitling MLHG to treble damages and attorney's fees.

235.    Beck's, By David's and Opal's unauthorized use of MLHG's trade name and common law service mark in connection with their sale of goods and services constitutes a false

designation of origin and a false representation that Beck's, By David's and Opal's goods and services are sponsored by, approved by, or otherwise associated with MLHG.

236.   MLHG is seeking as part of its requested relief that Beck, By David and Opal, and those acting in concert with any of them, be ordered to cease and desist from using the MLHG trade name and common law service mark "Maiden Lane Events" and be ordered to account to MLHG for all profits Beck, By David and Opal obtained from their use thereof.

237.   In an email sent on September 5, 2017 from Beck's MLHG email account to Malcolm at MLHG, Beck wanted to arrange for how Beck would be compensated for all events Beck referred to MLHG but were solicited by him while Beck was a Manager or Member of MLHG and using MLHG emails and resources.

238.   Beck, By David, Opal and anyone acting in concert with any of them should be ordered to account to MLHG for all events and revenues from third parties Beck solicited while Beck was at MLHG that he directed away from MLHG to Opal, By David, or anyone else, or for which Beck seeks compensation from MLHG as a condition for Beck to refer that event to MLHG even though Beck originally solicited the event on behalf of MLHG.

239.   Beck, Opal, By David and anyone else acting in concert with any of them should also be ordered to cease contacting Downtown for any matter affecting or that could affect MLHG, whether on behalf of Howard Hughes, Beck, By David, Opal, Creative or anyone else.

240.   Beck, Opal, By David and anyone else acting in concert with any of them should have a constructive trust place over their bank accounts and profits.

241.   Beck's use of Opal to solicit MLHG customers violates Paragraph 6.5 of the Operating Agreement.

**Beck's and Weinstein's falsified MLHG books and records cause undisclosed tax liabilities:**

242.     Beck's and Weinstein's schemes were not limited to diverting MLHG funds for Beck's personal use or to the creation of the CC Agreements so that Beck could avail himself of a salary in violation of the MLHG Operating Agreement.  With the active assistance of Weinstein, Beck and Weinstein maintained three sets of books and records on QuickBooks:

a.     One set of books and records recorded the cash sales at the cash registers/point of sale terminals.

b.     A second set omitted those cash sales in whole or in substantial part.

c.     A third set omitted accounts payable to vendors for the purpose of misleading potential investors such as Potentis into believing the amount of additional capital MLHG needed in order to get to break-even was less than what MLHG really needed because of the material under-statement of the amount of MLHG's accounts payable to vendors.

243.     Omitting liabilities like those accounts payable resulted in the balance sheets and profit lines in MLHG's financial statements presented to Potentis and to the other Members of MLHG to be false and misleading.

244.     None of the MLHG financial books and records shown to Potentis or to MLHG Members identified Beck's $125,000.00/year salary via the CC Agreements.

245.     Beck's and Weinstein's purposes in maintaining multiple sets of books and records was to report one set of numbers to MLHG Members and to potential investors such as Potentis, to report a different set of numbers to the sales tax and other tax authorities, to conceal Beck's deal and salary under the CC Agreements and to conceal the cash transfers Beck made among MLHG, Beck and By David.

246.     Beck and Weinstein thereby fabricated sales tax figures for New York State sales tax purposes, and fabricated revenue, expense and net income figures for Federal and New York state

income tax reporting purposes.  That enabled Beck to divert to himself cash received or which was supposed to have been received by MLHG, and to divert to himself other funds to which MLHG was entitled to receive from at least one customer.

247.    In addition to causing MLHG substantial losses in its own revenue and income, Beck's and Weinstein's scheme has caused MLHG to incur substantial sales tax liability and to under-report to Potentis the amount of MLHG's liabilities to vendors that included trade creditors as well as the sales tax authorities.

248.    Potentis has funded payment of the MLHG sales tax liabilities and caused MLHG to file amended and corrected sales tax returns, and also funded payments to trade creditors to keep MLHG in business.

249.    During the course of Potentis' due diligence, and in the course of providing financial and other information to MLHG's Members from the inception of MLHG, including federal tax forms K-1 that the MLHG Members used in connection with their own federal, New York State income tax filings, Beck and Weinstein knowingly sent in interstate commerce false MLHG financial, tax and other MLHG business information to Potentis and the MLHG Members in order to induce Potentis to purchase MLHG securities, to induce Potentis to execute and deliver the Operating Agreement, which was an investment contract, and to induce the MLHG Members into believing that MLHG needed a cash infusion, that MLHG was being run properly as a start-up, and to consent to Potentis making an investment and becoming a Member of MLHG.

**Beck's Ultimate Removal as Manager:**

250.    In June 2017, Matthew Herfield ("Herfield") was appointed as a second Manager of MLHG by a majority of the Members.  Because MLHG then had two Managers, certain actions to

be taken by Beck as MLHG Manager also required Herfield's consent as the second Manager as set forth in the Operating Agreement. Beck ignored that requirement.

251. Beck was ultimately removed as Manager on or about August 8, 2017.

252. Between the time in June 2017 when Herfield was added as a Manager, and August 8, 2017 when Beck was removed as a Manager, Beck (a) excluded Herfield from any involvement in any MLHG matter in which Beck was involved, (b) continued to divert MLHG funds to himself and to By David, (c) continued to act as if Beck not only was a Manager of MLHG, but the only Manager of MLHG, (d) continued to direct third parties' actions vis-à-vis MLHG, including Weinstein and Zbrella, as if Beck was a Manager or the only Manager of MLHG, and (e) diverted MLHG corporate opportunities to Opal.

253. On or about August 8, 2017, in connection with Beck's removal as Manager, Beck was notified in writing that MLHG and Potentis had evidence that Beck diverted MLHG funds to Beck's own account. At that time, the full scope of Beck's diversion and other frauds and misrepresentations or the participation of the other Defendants in Beck's frauds was not completely known to MLHG or to Potentis.

**Beck's and Weinstein's Securities Fraud:**

254. As a result of its purchase of securities from MLHG for cash and marketing and development services provided by Potentis, Potentis took an aggregate 32.5 percent membership interest in MLHG.

255. At the time of its investment in MLHG, (a) Beck was MLHG's sole Manager, (b) Potentis had no option but to rely and expected to rely on Beck's efforts as MLHG's sole Manager because its investment did not include a right to control Beck or his actions, and (c) Potentis

considered the Operating Agreement as an investment contract pursuant to which Potentis's return on its investment was dependent on Beck's efforts on behalf of MLHG.

256.     Potentis's purchase of its MLHG Membership interest was the purchase of a security and its entering into the Operating Agreement was MLHG's entering into and paying consideration for an investment contract.

257.     A reasonable investor would have been misled by Beck's and Weinstein's false and misleading verbal and written statements made to Potentis.

258.     Potentis relied on, was entitled to rely on, and was misled by Beck's and Weinstein's false and misleading statements made to induce Potentis to purchase MLHG securities and to sign the Operating Agreement which was an investment contract.

259.     Potentis was induced to execute and deliver the Operating Agreement and to purchase MLHG securities and misled not to sell those securities in between the time the misrepresentations were made by Beck and Weinstein, and the time the truth was revealed.

260.     Potentis has suffered actual losses in an amount to be determined at trial, not less than its investment to date of not less than $2,200,000.00, or to recover Potentis's investment of $300,000.00 plus the $1,900,000.00 in the diminished value of the securities Potentis purchased and investment contract Potentis entered into, as a direct result of, and proximately caused by, Beck's and Weinstein's fraudulent, manipulative and deceptive conduct.

261.     Loss causation is established in that the damages suffered by Potentis were a foreseeable consequence of the misrepresentations by Beck and Weinstein and were caused by the Defendants' misrepresentations.

262.     Beck's and Weinstein's wrongful conduct as alleged in this Complaint directly and proximately caused the economic loss suffered by Potentis.

263.    Beck perpetrated the frauds described in this Complaint on Potentis, and Weinstein likewise perpetrated the frauds described in this Complaint on Potentis and also substantially assisted Beck in Beck's frauds.

264.    Weinstein set up the MLHG internal control and bookkeeping systems, or lack thereof, and that enabled Beck to misappropriate and divert MLHG cash and other funds to which Beck was not entitled for the benefit of Beck and his family.

265.    Potentis purchased or acquired MLHG securities at an artificially inflated price and was damaged thereby.

266.    The actual price of the MLHG securities Potentis purchased was significantly lower because of the misrepresentations made to Potentis by Beck and Weinstein, and/or the information alleged in this Complaint to have been concealed from Potentis by each of Weinstein and Beck, thereby causing Potentis's losses.

267.    Scienter is established because, as alleged in this Complaint, each of Beck and Weinstein knew, or recklessly disregarded the fact, that the documents provided and statements made by each of them to Potentis were materially false and misleading.

268.    Beck and Weinstein knowingly and substantially participated or acquiesced in the issuance or dissemination of those fraudulent, false and/or misleading statements and documents as primary violations of the federal securities laws.

269.    By virtue of Beck's and Weinstein's possession of documents and information reflecting the true facts regarding MLHG, and Beck's and Weinstein's control over MLHG, each of Beck and Weinstein was an active and culpable creator and participant in the fraudulent schemes alleged in this Complaint.

270.     Each of Beck and Weinstein knew or was severely reckless in disregarding the fact that the statements each of Beck and Weinstein provided to Potentis verbally and in writing were, when made, materially false and misleading and/or omitted to state other facts necessary to make the statements each of Beck and Weinstein did make to Potentis not false or misleading.

271.     Each of Beck and Weinstein knew and intended that Potentis would rely to Potentis's detriment on those false or misleading statements and documents provided to Potentis by each of Beck and Weinstein.

272.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

273.     The statements alleged in this Complaint to be false and misleading all relate to then-existing facts and conditions.

274.     In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

275.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded in this Complaint, each of Beck and Weinstein is liable to Potentis, jointly and severally, for those false or misleading forward-looking statements because at the time each of those forward-looking statements was made, Beck and Weinstein had actual knowledge that the forward-looking statements were materially false or misleading and that Potentis would rely on the same to Potentis's detriment.

## Count I
### (Violation of the Defend Trade Secrets Act by Beck, Against David, Zbrella and Opal)

276.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

277.     MLHG possesses many trade secrets including, but not limited to, MLHG's financial information, recipes, marketing plans and efforts, customer lists, customer and potential customer data, and other proprietary information (the "Trade Secrets").

278.     The Trade Secrets have significant value to MLHG in its business.

279.     Each of Beck, By David, Zbrella and Opal has, by their wrongful conduct, misappropriated the Trade Secrets, in violation of the Defend Trade Secrets Act, 18 U.S.C. §1836(b).

280.     That misappropriation includes (a) use by Beck of MLHG's Trade Secrets in his dealings with Howard Hughes and by By David, Opal and Beck in soliciting MLHG customers for their own benefit; and (b) Zbrella aiding and abetting Beck in accessing MLHG's emails and computer servers at a time when Beck was no longer MLHG's sole Manager or Manager at all and was not entitled to control or to access the same.

281.     MLHG has suffered damages as a result of the misappropriation by each of Beck, By David, Zbrella and Opal of MLHG's Trade Secrets.

282.     MLHG seeks judgment for MLHG's damages as a result of the misappropriation by each of Beck, By David, Zbrella and Opal, and anyone acting in concert with any of them, of MLHG's Trade Secrets, in an amount to be determined at trial.

283.     MLHG requests that this Court order an accounting of the profits derived by each of Beck, By David, Zbrella and Opal, and anyone acting in concert with any of them, from their misappropriation of MLHG's Trade Secrets.

284.     MLHG requests that this Court order Beck, By David, Zbrella and Opal, and

anyone acting in concert with any of them, to disgorge to MLHG all of the profits derived by each of Beck, By David, Zbrella and Opal, or anyone acting in concert with any of them, from their misappropriation of MLHG's Trade Secrets.

285.    MLHG requests that this Court order each of Beck, By David, Zbrella and Opal, and anyone acting in concert with any of them, to return all MLHG Trade Secrets to MLHG and to cease using any of MLHG's Trade Secrets.

## Count II
## (Violations of the Computer Fraud and Abuse Act Against Beck and Zbrella)

286.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

287.    MLHG's computers and computer systems are "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. §1030(e)(2).

288.    By their wrongful actions, Beck and Zbrella intentionally accessed and Zbrella aided and abetted Beck in accessing MLHG's protected computer systems, without authorization or in excess of authorized access, and thereby obtained and utilized information and Trade Secrets from MLHG's protected computer systems for the purposes of destroying or attempting to destroy emails, alter or delete financial data, or to allow Beck, By David and Opal to compete unfairly with MLHG, all for the purpose of engaging in unfair competition, deceptive trade practices and misappropriating the Trade Secrets.

289.    The wrongful actions of Beck and Zbrella have caused loss to MLHG that exceeds $5,000 in any one year period in that MLHG has spent more than $5,000 in responding to the offense, restoring and verifying the information damaged or sought to be damaged on the protected computer systems and in conducting a damage assessment.

290.     Zbrella acted as administrator over MLHG's email and other servers and, either wholly without authorization or entirely exceeding any authorized access, intentionally accessed the MLHG computer systems and allowed Beck to access the same, and denied MLHG access to the same.

291.     Zbrella's purpose was to allow Beck and not anyone else at MLHG to have administrative or other control over the MLHG computers and data thereon, and to allow Beck and Zbrella to seize and misappropriate the information contained thereon for the benefit of Beck and the detriment of MLHG, including the personal and privileged communications of MLHG and Potentis, among other Members of MLHG, stored on those computer systems, and the Trade Secrets.  Neither Beck nor Zbrella was entitled to obtain such data or Trade Secrets from the MLHG computer systems.

292.     Zbrella refused to allow MLHG, its client, access to MLHG's own computer systems, thereby causing MLHG to incur expense to engineer a backdoor way to gain access to those systems at considerable cost to MLHG and with delay in MLHG being able to attend to its own business affairs and business opportunities being caused solely by Zbrella.

293.     Zbrella's actions as administrator of MLHG's computers caused MLHG to lose business opportunities as a result of the unavailability to MLHG to exclusively control the MLHG computer systems and allowed Beck to divert MLHG business opportunities to himself or to By David or Opal.  The lost business to MLHG exceeds $5,000.

294.     The activities of Beck and Zbrella constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. §§1030(a)(2)(C), (a)(4), (a)(5)(C).

295.     MLHG is entitled to full compensatory damages from Beck and Zbrella under the Computer Fraud and Abuse Act.

296.    MLHG requests that this Court order Beck and Zbrella and anyone acting in concert with either of them to cease and desist from using any information they obtained from MLHG in violation of the Computer Fraud and Abuse Act.

297.    MLHG requests that this Court order Beck and Zbrella and anyone acting in concert with either of them to return to MLHG without retaining any copies any and all information they obtained from MLHG in violation of the Computer Fraud and Abuse Act.

298.    MLHG requests that this Court order Beck and Zbrella and anyone acting in concert with either of them to account for all business, business opportunities pursued, revenues and profits any of them derived from using any information they obtained from MLHG in violation of the Computer Fraud and Abuse Act.

**Count III**
**(Violations of Electronic Communications Privacy Act Against Beck, By David, Opal and Zbrella)**

299.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

300.    Electronic communications transmitted to, from and between MLHG employees and its counsel and through MLHG's messaging systems and email exchange are "electronic communications" affecting interstate commerce as defined in 18 U.S.C. §2510.

301.    Beck, By David, Opal, and Zbrella, either directly or by aiding, abetting and/or conspiring and endeavoring to do so among one or more of themselves, and possibly acting in concert with others, have intentionally intercepted and/or endeavored or procured to be intercepted, MLHG's electronic communications by and through its email exchange system without MLHG's knowledge, authorization, or consent in violation of 18 U.S.C. §2511.

302.    Beck, By David, Opal, and Zbrella, either directly or by aiding, abetting and/or conspiring and endeavoring to do so among one or more of themselves, and possibly acting in concert with others, have also intentionally used and/or procured to be used a device to intercept the above-referenced MLHG electronic communications.

303.    Beck, By David, Opal, and Zbrella, either directly or by aiding, abetting and/or conspiring and endeavoring to do so, either directly or by aiding, abetting and/or conspiring to do so among one or more of themselves, and possibly acting in concert with others, have also intentionally disclosed to another person, including without limitation Howard Hughes, and/or used, the contents of the above-referenced electronic communications and Trade Secrets embodied therein.

304.    The conduct of Beck, By David, Opal, and Zbrella, either directly or by aiding, abetting and/or conspiring and endeavoring to do so, and possibly acting in concert with others, in intercepting, procuring to be intercepting and/or using or disclosing Plaintiffs' protected, electronic communications without its knowledge or consent was willful and intentional and was committed for the purpose of engaging in tortious, deceptive behavior, and unlawful competitive behavior, and unlawful disclosure of MLHG Trade Secrets, all in violation of the federal Electronic Communications Privacy Act, 18 U.S.C. §2510.

305.    MLHG is entitled to compensatory damages under the Electronic Communications Privacy Act in an amount to be determined at trial.

306.    MLHG requests that this Court order Beck, By David, Opal, and Zbrella, and anyone acting in concert with any of them, to cease and desist from using any information they obtained from MLHG in violation of the Electronic Communications Privacy Act.

307.    MLHG requests that this Court order Beck, By David, Opal, and Zbrella, and anyone acting in concert with any of them, to return to MLHG without retaining any copies any and all

information any of them obtained from MLHG in violation of the Electronic Communications Privacy Act.

308.    MLHG requests that this Court order Beck, By David, Opal, and Zbrella, and anyone acting in concert with any of them, to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG in violation of the Electronic Communications Privacy Act.

## Count IV
### (Trade Name Infringement under Lanham Act §43(a), 15 U.S.C. § 1125(a) Against Beck, By David and Opal)

309.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

310.    Beck's, By David's and Opal's use of the trade name and common law service mark "Maiden Lane Events" is an attempt to confuse and divert MLHG's customers and prospective customers and to induce them to purchase Beck's, By David's and Opal's services instead of MLHG's services.

311.    Beck, By David and Opal are infringing the MLHG trade name and common law service mark "Maiden Lane Events" by using that exact same trade name and common law service mark without license or authorization.

312.    Beck, By David and Opal are unfairly competing with MLHG and diluting the value of the MLHG trade name and common law service mark "Maiden Lane Events" by using it without license or authorization and is thereby tarnishing, blurring, and diluting MLHG's reputation, goodwill, and trade name.

313.    Beck, By David and Opal are engaged in federal and common law unfair competition by causing consumer confusion as to the source and sponsorship of their services.

314.     Beck's, By David's and Opal's improper conduct is willful, intentional, and in bad faith.

315.     Beck's, By David's and Opal's Defendant's continued willful use of MLHG's trade name and common law service mark "Maiden Lane Events" being without right, license, or authorization, is likely to cause confusion and therefore constitutes infringement of MLHG's rights in that trade name under the Lanham Act, 15 U.S.C. §1125.

316.     MLHG has been substantially and irreparably injured by Beck's, By David's and Opal's conduct, and having no adequate remedy at law, will continue to be substantially and irreparably injured unless and until they are permanently enjoined from infringing MLHG's trade name and common law service mark "Maiden Lane Events."

317.     Beck's, By David's and Opal's obtained profits from their improper conduct and MLHG has sustained actual damages as a result of Beck's, By David's and Opal's willful infringement in an amount that has yet to be determined and will be determined at trial.

318.     Beck's, By David's and Opal's conduct has been intentional and willful, and gave them an advantage they otherwise would not have had absent their improper use of MLHG's trade name and common law service mark "Maiden Lane Events," entitling MLHG to treble damages and attorney's fees.

319.     Beck should have while serving as Manager of MLHG registered or attempted to register for MLHG "Maiden Lane Events" as a trademark or service mark, either federally or with New York State, but failed to do so for his own improper motives.

320.     MLHG is entitled to compensatory damages under the Lanham Act in an amount to be determined at trial plus treble damages plus attorneys' fees.

321.     MLHG requests that this Court order all Defendants to cease and desist from using "Maiden Lane Events" in any way.

322.     MLHG requests that this Court order all Defendants to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG using the trade name "Maiden Lane Events."

## Count V
### (Common Law Trademark Infringement Against Beck, By David and Opal)

323.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

324.     Beck's, By David's and Opal's use of the trade name and common law service mark "Maiden Lane Events" is an attempt to confuse and divert MLHG's customers and prospective customers and to induce them to purchase Beck's, By David's and Opal's services instead of MLHG's services.

325.     Beck, By David and Opal are infringing the MLHG trade name and common law service mark "Maiden Lane Events" by using that exact same trade name and common law service mark without license or authorization.

326.     Beck, By David and Opal are unfairly competing with MLHG and diluting the value of the MLHG trade name and common law service mark "Maiden Lane Events" by using it without license or authorization and is thereby tarnishing, blurring, and diluting MLHG's reputation, goodwill, and trade name.

327.     Beck, By David and Opal are engaged in federal and common law unfair competition by causing consumer confusion as to the source and sponsorship of their services.

328.     Beck's, By David's and Opal's improper conduct is willful, intentional, and in bad faith.

329.    MLHG has been substantially and irreparably injured by Beck's, By David's and Opal's conduct, and having no adequate remedy at law, will continue to be substantially and irreparably injured unless and until they are permanently enjoined from infringing MLHG's trade name and common law service mark "Maiden Lane Events."

330.    Beck's, By David's and Opal's obtained profits from their improper conduct and MLHG has sustained actual damages as a result of Beck's, By David's and Opal's willful infringement in an amount that has yet to be determined and will be determined at trial.

331.    Beck's, By David's and Opal's conduct has been intentional and willful, and gave them an advantage they otherwise would not have had absent their improper use of MLHG's trade name and common law service mark "Maiden Lane Events," entitling MLHG to treble damages and attorney's fees.

332.    Beck should have while serving as Manager of MLHG registered or attempted to register for MLHG "Maiden Lane Events" as a trademark or service mark, either federally or with New York State, but failed to do so for his own improper motives.

333.    MLHG is entitled to compensatory damages under the Lanham Act in an amount to be determined at trial plus treble damages plus attorneys' fees.

334.    MLHG requests that this Court order all Defendants to cease and desist from using "Maiden Lane Events" in any way.

335.    MLHG requests that this Court order all Defendants to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG using the trade name "Maiden Lane Events."

**Count VI**
**(Breach of Fiduciary Duty Against Beck and Weinstein)**

336.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

337.    At all relevant times, each of Beck and Weinstein owed each of the Plaintiffs a fiduciary duty.

338.    That fiduciary duty owed and breached by each of Beck and Weinstein included and includes, without limitation, the duty:

a.    to deal honestly and fairly with MLHG each Plaintiff in connection with all matters relating to the business of MLHG;

b.    not to divert or cause or aid and abet the diversion of MLHG funds to Beck, By David, Opal, or Creative;

c.    not to misappropriate or cause or aid and abet the misappropriation of Plaintiff's cash and other property to Beck, By David, Opal, or Creative, and not to conceal the same from Potentis;

d.    to protect, support, and vindicate the interests of MLHG in connection with MLHG's business;

e.    not to serve or exalt his own interests in the MLHG business, instead, in place of, or at the expense of, the interests of MLHG or Potentis;

f.    to assure in good faith that all economic rights and entitlements of MLHG, including but not limited to MLHG's rights to payment and/or financial distributions, in connection with its business, are duly honored; and

g.    in all respects to deal honestly and fairly with MLHG and Potentis.

339.    The AICPA (American Institute of Certified Public Accountants) states regarding the standard of care and professional responsibility of an accountant: "Generally, if the following three elements are present in a client relationship, an accountant may be deemed to be a fiduciary

to their client: (i) the accountant holds himself or herself out as an expert in an aspect of business, (ii) the client places a high degree of trust and confidence in the accountant and (iii) the client is heavily dependent upon the accountant's advice."

https://www.aicpa.org/interestareas/personalfinancialplanning/resources/practicecenter/professionalresponsibilities/fiduciarystandardofcare.html

340.    Weinstein is a Certified Public Accountant (CPA).

341.    MLHG did not have audited financial statements.

342.    Weinstein (a) held himself out as an expert in creating systems and books and records for MLHG and in other aspects of setting up and maintaining an operating business, (b) MLHG placed a high degree of trust and confidence in Weinstein as its external supposedly independent accountant, and (c) MLHG as a start-up was heavily dependent upon the accountant's advice.

343.    By virtue of the foregoing each of Beck and Weinstein breached his fiduciary duties to MLHG.

344.    Weinstein and Beck concealed the frauds alleged in this Complaint from Potentis in connection with Beck's solicitation of an investment in MLHG securities from Potentis and in soliciting Potentis to execute and deliver an investment contract, namely the Operating Agreement.

345.    By virtue of the foregoing, MLHG has suffered injury and damages, for which Beck and Weinstein should be liable in an amount to be determined.

**Count VII**
**(Misappropriation of Confidential and Proprietary Information Against Zbrella, Weinstein and Beck)**

346.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

347.     At all times relevant to the matters set forth in this Complaint, each of Beck and Weinstein was a fiduciary of MLHG or owed MLHG a duty not to misappropriate and use for Beck's benefit to the detriment of MLHG any Trade Secrets or other MLHG confidential and proprietary information which is unique to MLHG and not generally known throughout the industry or to the public.

348.     Even if Beck or Weinstein is not deemed to be a fiduciary to MLHG, each should be liable for the damages they caused MLHG by virtue of their misappropriation of Trade Secrets and confidential and proprietary information of MLHG as set forth in this Complaint, in each case in an amount to be determined at trial.

349.     At all times relevant to the matters set forth in this Complaint, Zbrella had access to and was administrator having control over MLHG's computers and access thereto, and was privy to the confidential and proprietary information of MLHG, which is unique to MLHG and not generally known throughout the industry or to the public.

350.     By virtue of his position as a fiduciary, and as President and Manager of MLHG, Beck was privy to the confidential and proprietary information of MLHG, which is unique to MLHG and not generally known throughout the industry or to the public.

351.     By virtue of his position as a fiduciary, and as external accountant and CPA to MLHG, Weinstein was privy to the Trade Secrets and the confidential and proprietary information of MLHG, which is unique to MLHG and not generally known throughout the industry or to the public

352.     MLHG protected its Trade Secrets and this confidential and proprietary information, and Zbrella, Beck and Weinstein were aware of the same, including by passwords to access those Trade Secrets and that information.

353.     By their acts alleged in this Complaint, including Becks' theft of and disclosure to Howard Hughes, By David, Opal and Creative of MLHG's Trade Secrets and confidential and proprietary information, and by Weinstein's creation of multiple sets of books and records, Weinstein and Beck have wrongfully disclosed and used MLHG's confidential and proprietary information.

354.     By their acts alleged herein, Zbrella's refusal to give MLHG administrative control over MLHG's own computers and Zbrella's deletion or attempt to delete or aid and abet Beck in the deletion of MLHG data from its computers, Zbrella has wrongfully prevented MLHG from accessing its own proprietary and secret data, and Zbrella has wrongfully used MLHG's Trade Secrets and confidential and proprietary information.

355.     By reason of the acts of Zbrella, Weinstein and Beck alleged in this Complaint, MLHG has suffered, is suffering and will continue to suffer harm and damages in an amount to be determined at trial.

## Count VIII
## (Unjust Enrichment Against Beck, Against David, Creative and Opal)

356.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

357.     By virtue of the actions of and misappropriation by Beck, By David, Creative and Opal, as well as the other Defendants, as described in this Complaint, MLHG and Potentis each provided substantial benefits to Beck and to By David, Creative and Opal.

358.     None of Beck, By David, Creative or Opal provided anything to MLHG or Potentis in return for those misappropriated benefits.

359.     By virtue of the foregoing, Beck, By David, Creative and Opal have been and continue to be unjustly enriched.

360.     By virtue of the foregoing, MLHG and Potentis have suffered damages for which Beck, By David, Creative and Opal are liable, in an amount to be determined.

361.     As a result of Creative's, By David's and Opal's participation in Beck's and Weinstein's frauds, the Court should order Creative, By David and Opal to disgorge and pay to Plaintiffs all revenues and all profits and all expenses paid for the benefit of each of Creative, By David and Opal by MLHG

### Count IX
### (Conversion Against Beck, Weinstein, Creative, Opal, and By David)

362.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

363.     As described in this Complaint, Beck, Weinstein, Opal, and By David used By David and Creative to transfer MLHG funds and assets to By David, to Creative, and to Beck personally.

364.     Those funds and assets rightfully belong to MLHG.  Beck, Weinstein, Creative, Opal, and By David are liable to MLHG for the conversion of those funds and assets.

365.     The Court should order an accounting, at the expense of Beck, Weinstein, Creative, Opal, and By David, of all funds and assets of MLHG that were wrongfully converted by any of Beck, Weinstein, Creative, Opal, and By David, or anyone acting in concert with any of them.

366.     Plaintiffs have demanded a return of the funds and assets wrongfully converted as set forth herein.

367.     By virtue of the foregoing MLHG has suffered damages, in an amount to be determined, for which Beck, Weinstein, Creative, Opal, and By David Defendants are liable.

### Count X
### (Usurpation of Corporate Opportunity Against Beck and Opal)

368.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

369.    Beck used and or attempted to leverage his role at MLHG into a role at Howard Hughes, and to compete with and to take business away from MLHG.

370.    MLHG was in a position to exploit that business opportunity, but for Beck's attempts to hijack it.

371.    By virtue of the foregoing, Beck has usurped MLHG's corporate opportunities.

372.    By virtue of the foregoing, Beck was using MLHG information, Trade Secrets and the time Beck was supposed to have been generating business for MLHG instead to promote himself to Howard Hughes to aid and abet Howard Hughes as a competitor to MLHG.

373.    Beck caused Opal to usurp one or more corporate opportunities that belonged to MLHG as a result of MLHG owning and having all right, title and interest in and to the common law service mark and trade name "Maiden Lane Events" but Beck diverting "Maiden Lane Events" bookings to Opal.

374.    By virtue of the foregoing, MLHG has suffered damages in an amount to be determined, for which Beck and Opal are liable.

375.    By virtue of the foregoing, the Court should order Beck to account for his use of MLHG resources and Trade Secrets and other confidential information disclosed by Beck to Howard Hughes and otherwise used or diverted by Beck for his personal benefit and for the benefit of Opal.

**Count XI**
**(Common Law Fraud Against All Defendants)**

376.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

377.    As alleged above in this Complaint, Defendants made fraudulent and false statements of material fact, and omitted material facts necessary in order to make their statements, in light of the circumstances under which the statements were made, not misleading.

378.    Defendants knew at the time that their statements were made that they were false, or at the very least made recklessly and intentionally if not fraudulently.

379.    Defendants knew or recklessly disregarded that MLHG (and its Members and prospective Members such as Potentis) were relying on their statements, and they encouraged such reliance through their actions, as described herein, including after Potentis was a Member of MLHG.

380.    Defendants knew or recklessly disregarded that MLHG (and its Members and prospective Members such as Potentis) would rely upon their representations in connection with the operation of MLHG.

381.    Defendants were in a position of unique and superior knowledge regarding the true facts concerning the foregoing material misrepresentations and omissions.

382.    MLHG (and its Members and prospective Members such as Potentis) justifiably, reasonably, and foreseeably relied upon Defendants' representations and false statements regarding the true state of MLHG and its financial and business affairs.

383.    As a result of Defendants' false and misleading statements and omissions, as alleged in this Complaint, Plaintiffs have suffered substantial damages in an amount to be determined, including incurring losses resulting directly from the misappropriation by Beck of MLHG funds and other assets, as assisted by the other Defendants.

### Count XII
### (Accounting Against Beck, By David, Opal, Creative and Weinstein)

384.    Plaintiff s repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

385.     Defendants Beck, By David, Opal, Creative and Weinstein, have misappropriated and/or hidden assets and funds belonging to MLHG, or aided and abetted the others of them in doing so.

386.     Plaintiffs are entitled to a full accounting by Beck, By David, Opal, Creative and Weinstein of all funds and other assets, financial information, customer lists, books, names of any and all related entities which are, have, or may be working with, or received payments or other funds diverted from MLHG and the names of the beneficial owners of those companies, and all other pertinent information to determine the whereabouts of MLHG's funds.

### Count XIII
### (Tortious Interference with Contract Against Beck)

387.     Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

388.     MLHG has a Management Agreement with Downtown.

389.     Beck knew of the existence of the Management Agreement when Beck approached Howard Hughes about Howard Hughes doing business at the Property.

390.     Beck induced or attempted to induce Downtown to breach its Management Agreement with MLHG, and attempted to have Downtown contract with a direct competitor of MLHG.

391.     By virtue of the foregoing, Beck has willfully and tortiously interfered with MLHG's Management Agreement with Downtown, all while Beck was and is a Member of MLHG and while Beck was MLHG's Manager.

392.     By virtue of the foregoing, MLHG has suffered damages in an amount to be determined for which Beck is liable.

### Count XIV

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Beck and Weinstein)**

393.     Potentis repeats and re-alleges each allegation in the foregoing paragraphs as if the same were fully set forth herein.

394.     This Count is asserted by Potentis against Beck and Weinstein based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

395.     Beck and Weinstein, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, knowingly or with reckless disregard for the truth made untrue statements of a material fact or omitted to state a material fact necessary to make the statements each of them made to Potentis, in light of the circumstances under which they were made to Potentis, not misleading.

396.     Information showing that Beck and Weinstein acted knowingly or with reckless disregard for the truth is peculiarly within Beck's and Weinstein's knowledge and control.  As the Manager and Accountant of MLHG, respectively, Beck and Weinstein had knowledge of the details of MLHG's internal financial and operational business affairs.

397.     Beck's and Weinstein's knowledge was superior to Potentis's knowledge.  Beck's and Weinstein's knowledge was also of the fraudulent conduct of Beck and Weinstein as described in this Complaint, conduct Beck and Weinstein affirmatively concealed from Potentis.

398.     Beck and Weinstein had a duty to Potentis, in light of the provisions of the Acquisition Agreement, to disseminate timely, accurate, and truthful information with respect to MLHG's businesses, operations, then-present and future financial condition, and future prospects.

399.     As a result of the dissemination of the false and misleading statements and documents as set forth in this Complaint, the price of MLHG's securities were artificially inflated when Potentis purchased them.  In ignorance of the adverse facts concerning MLHG's business and financial

condition, which were concealed by Defendants, Potentis purchased a MLHG security and entered into the Operating Agreement, which was an investment contract, at an artificially inflated price, and Potentis relied to its detriment upon the statements and documents disseminated by Beck and Weinstein, and Potentis was damaged thereby.

400.    Relying on the materially false and misleading statements described in this Complaint, which Beck and Weinstein made, issued or caused to be disseminated to Potentis, Potentis purchased a MLHG security and entered into the Operating Agreement, an investment contract, at a price artificially inflated by Beck's and Weinstein's wrongful conduct.

401.    Had Potentis known the truth, it would not have purchased any MLHG securities, or would not have purchased them at such an inflated price (and not made further investments into MLHG to clean up the vendor payables and sales tax owed due to the false reporting and concealed financial condition of MLHG), and would not have executed and delivered the Operating Agreement which was an investment contract.   At the time of the purchase by Potentis of its membership interest in MLHG, the true value of that security was substantially lower than the price paid by Potentis.

402.    By reason of the conduct alleged in this Complaint, Beck and Weinstein each knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

403.    As a direct and proximate result of Beck's and Weinstein's wrongful conduct, Potentis suffered damages of not less than $2,200,000.00, or not less than Potentis's investment of $300,000.00 plus the $1,900,000.00 in the diminished value of the securities Potentis purchased and investment contract Potentis entered into, in connection with its purchase of a MLHG security and execution and delivery of the Operating Agreement as an investment contract.

404.     Beck and Weinstein made false representations to Potentis as statements of fact that they knew were untrue at the time made in order to induce Potentis to invest in MLHG and to continue to hold its investment in MLHG.

405.     Potentis invested in MLHG and did not sell its investment in MLHG based on Beck's and Weinstein's misrepresentations and false statements both prior to, at the time of, and after Potentis purchased its membership interest in MLHG and executed and delivered the Operating Agreement.

406.     Potentis suffered damages of not less than $2,200,000.00 as a direct and proximate result of Beck's and Weinstein's actions and omissions.

## Count XV
## (Negligent Misrepresentation Against Beck and Weinstein)

407.     Potentis repeats and re-alleges each allegation in the foregoing paragraphs as if the same were fully set forth herein.

408.     Beck and Weinstein made false and misleading statements, and omitted material facts in said statements, as alleged in this Complaint.

409.     Beck and Weinstein acted negligently and recklessly in making statements of material fact that were false and misleading, and omitting material facts necessary to cause certain statements Beck and Weinstein did make to be not false and misleading.

410.     Beck and Weinstein had reason to believe, and did in fact believe, that Potentis would rely, and Potentis did in fact rely, on Beck's and Weinstein's statements of material fact when Potentis made its decision to buy and maintain a MLHG security and to execute and deliver the Operating Agreement, which was an investment contract.

411.     Potentis suffered damages of not less than $2,200,000.00 as a direct and proximate result of Beck's and Weinstein's negligent misrepresentations.

**Count XVI**
**(Permanent Injunction Against All Defendants)**

412.    Plaintiffs repeat and re-allege each and every allegation in the foregoing paragraphs as if the same were fully set forth herein.

413.    Defendants' actions, and in particular, their continued unfair competition based on the possession, use and control of Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events", have irreparably damaged MLHG, and that damage is continuing.

414.    An injunction to prevent the further actual or threatened unfair competition and use of Trade Secrets or other MLHG confidential and proprietary information is justified.

415.    MLHG has no adequate remedy at law.

416.    By reason of the foregoing, MLHG is entitled to a permanent injunction (a) restraining the Defendants from (a) possessing, disclosing and/or using any of the Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events"; (b) divulging the Trade Secrets or other MLHG confidential and proprietary information to anyone or using Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events", for their own benefit or for the benefit of any third party; (c) performing any work obtained as a result of any of the information contained in Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events", or, in the alternative, requiring all funds collected as a result of said work to be held in escrow or deposited with the Court pending an accounting to MLHG for profits wrongfully obtained from such work and for other damages MLHG has suffered by reason of Defendants' unlawful conduct; and (d) directing

Defendants to permanently and irrevocably purge their files – paper and electronic – of all references to information derived from Trade Secrets or other MLHG confidential and proprietary information.

**WHEREFORE**, MLHG and Potentis requests that judgment be entered against the Defendants as follows:

1.      Ordering all Defendants to account for all funds, books and records of MLHG misappropriated or diverted by any of the Defendants;

2.      Awarding compensatory Damages to be determined at trial, but not less than $5,000,000 to MLHG and not less than $2,200,000.00 to Potentis based on the misappropriations and diversions by Defendants;

3.      Ordering all Defendants to account for all profits derived from their misappropriation of MLHG's Trade Secrets;

4.      Awarding damages for Defendants' misappropriation of Plaintiff's Trade Secrets in an amount to be proven at trial, but in excess of the jurisdictional limits of this Court and including injunctive relief requiring Defendants to return all MLHG Trade Secrets to MLHG and to cease using any of MLHG's Trade Secrets;

5.      Ordering all Defendants to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG in violation of the Computer Fraud and Abuse Act;

6.      Awarding damages under the Computer Fraud and Abuse Act in an amount to be proven at trial, but in excess of the jurisdictional limits of this Court and including injunctive relief preventing Defendants from using any information they obtained from MLHG in violation of the Computer Fraud and Abuse Act and requiring Defendants to return to MLHG without retaining any

copies any and all information they obtained from MLHG in violation of the Computer Fraud and Abuse Act;

7.      Ordering all Defendants to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG in violation of the Electronic Communications Privacy Act;

8.      Awarding damages under the Electronic Communications Privacy Act in an amount to be proven at trial, but in excess of the jurisdictional limits of this Court and including injunctive relief preventing Defendants from using any information they obtained from MLHG in violation of the Electronic Communications Privacy Act and requiring Defendants to return to MLHG without retaining any copies any and all information they obtained from MLHG in violation of the Electronic Communications Privacy Act;

9.      Ordering all Defendants to account for all business, business opportunities pursued, revenues and profits they derived from using any information they obtained from MLHG using the trade name "Maiden Lane Events";

10.      Awarding damages under the Lanham Act plus treble the greater amount of MLHG's damages or Defendants' profits as a result of Defendants' federal unfair competition together with MLHG's costs and attorney's fees in this action treble damages plus attorneys' fees;

11.      Awarding damages as a result of Defendants' common law trademark infringement in an amount to be proven at trial, but in excess of the jurisdictional limits of this Court;

12.      Awarding damages as a result of Defendant's common law unfair competition in an amount to be proven at trial, but in excess of the jurisdictional limits of this Court;

13.      Ordering all Defendants to account for all profits of Maidenfit services provided to Beck, his wife, or anyone else at the direction of Beck, without their payment therefor to Maidenfit,

and an accounting of all cleaning and other services provided by MLHG to Maidenfit without charge, as well as a judgment against Beck for the each of the foregoing amounts as determined in said accounting;

14. Awarding punitive damages in favor of MLHG in the sum of not less than $5,000,000.00;

15. Awarding punitive damages in favor of Potentis in the sum of not less than $6,600,000.00;

16. Issuing a permanent injunction (a) restraining the Defendants from (a) possessing, disclosing and/or using any of the Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events"; (b) divulging the Trade Secrets or other MLHG confidential and proprietary information to anyone or using Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events", for their own benefit or for the benefit of any third party; (c) performing any work obtained as a result of any of the information contained in Trade Secrets or other MLHG confidential and proprietary information including, without limitation, the MLHG trade name and common law service mark "Maiden Lane Events", or, in the alternative, requiring all funds collected as a result of said work to be held in escrow or deposited with the Court pending an accounting to MLHG for profits wrongfully obtained from such work and for other damages MLHG has suffered by reason of Defendants' unlawful conduct; and (d) directing Defendants to permanently and irrevocably purge their files – paper and electronic – of all references to information derived from Trade Secrets or other MLHG confidential and proprietary information;

17.    Awarding pre-and post-judgement interest at the maximum amount authorized by New York state law, currently 9% per annum under the New York Civil Practice Law & Rules, on all causes of action;

18.    Awarding MLHG and Potentis their costs and disbursements of this action including reasonable attorneys' fees and expenses as authorized by law; and

19.    Awarding such other and further relief that the Court deems just and proper.

Dated: August 9, 2018
     New York, New York

                     SHIPMAN & GOODWIN LLP
                     By: /s/ Stephen M. Forte_____
                           Michael T. Conway
                           Stephen M. Forte
                     Shipman & Goodwin LLP
                     400 Park Ave., Fifth Fl.
                     New York, NY 10022
                     Tel. (212) 376-3011
                     mconway@goodwin.com
                     sforte@goodwin.com

                     *Attorneys for Plaintiffs*

## VERIFICATION

STATE OF NEW YORK : 
 : 
CITY OF NEW YORK :

Matthew Herfield, being duly sworn, deposes and says:

1.      I am the Manager of Maiden Lane Hospitality Group LLC, and the Managing Member of Potentis Capital LLC, the Plaintiffs in the above-entitled action.

2.      I have read the foregoing Verified Complaint and know the contents thereof.  The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

_____
Matthew Herfield

Sworn to before me this 9th day of
August 2018

_____
Notary Public
My Commission Expires: 11/21/20



## **JURY DEMAND**

Plaintiffs hereby demand a jury trial as to all issues so triable.

Dated: August 9, 2018
       New York, New York

SHIPMAN & GOODWIN LLP

By: /s/ Stephen M. Forte
       Michael T. Conway
       Stephen M. Forte
Shipman & Goodwin LLP
400 Park Ave., Fifth Fl.
New York, NY 10022
Tel. (212) 376-3011
mconway@goodwin.com
sforte@goodwin.com

*Counsel for Plaintiffs*

EXHIBIT A



Creative Concepts NYC and Maiden Lane Hospitality

**Purpose**
Creative Concepts NYC is to become a division of Maiden Lane Hospitality as its Catering Department.

**Trial**
Move in Date is estimated to be July 1, 2016.
A Trial Period of 2 years will be put in place to see if we are a good fit for each other.

**Financials**
We are to form a joint account in which all events will be placed into this account.
    *1/3 of gross sales will be pulled from this account monthly to pay CCNYC debt. (we will have a breakdown of what the $$ is being allocated to monthly)
        *all catering salaries will be paid through this account
        *all catering kitchen payroll will be through this account
        *catering purchases (food/décor etc)

Maiden Lane Cafeteria Account will pay for:
        *Kitchen equipment
        *Cafeteria staff payroll
        *Mathew's salary
        *35% of Miguel's salary once he takes over the cafeteria
        *50% of Jeannette's Salary
        *any changes to cafeteria
        *food purchases for cafeteria/ cafeteria will have own account

We are to form a joint account in which all events will be placed into this account.
Maiden lane/CCNYC Catering account will pay:
        *1/3 of gross sales will be pulled from this account monthly to pay CCNYC debt. (we will have a breakdown of what the $$ is being allocated to monthly)
        *all catering office salaries will be paid through this account
            *Jeannette (50%), Evalyn, Josh, Julie, David
        *all catering kitchen payroll will be through this account (kitchen/drivers)
            *65% of Miguel's salary (other 35% will come from cafeteria once taken over)
        *catering purchases (food/décor etc)

**Office Salaries**
*Julie –30% shareholder- Salary to be-$135K (no longer commission) plus health insurance and vehicle and monthly expense of $500 (inclusive of phone, car insurance, travel expenses, gas)
and 15% profit share (yearly)

*Evalyn-put on salary $50k plus her event manager fees (health tbd), $50 in phone expenses/vacation time/sick days

*Josh- bump in salary-to $60K plus commissions/health- Change of title -$50 in phone expenses
Vacation time/sick days

*Jeannette-bump in salary $75k (50% spilt) plus health insurance/ 2 week vacation/sick days



## Kitchen Salaries

Miguel—Executive Chef and 70% shareholder.  Salary to be $150,000, plus health insurance, vehicle, monthly expenses of 1k (to include car insurance, phone, gas, travel).  15 % profit share (yearly),   Start from Catering and after starting in cafeteria will take 50% of salary from maiden lane acct.

**Sous Chef-** 50-65k with partial insurance. 1 week vacation pay after first year, 2 weeks vacation after 3rd year. Cell phone $60

**2 Cooks-** $16 an hour. No benefits, 2 weeks vacation, 3 personal/sick days, one cell phone $75

**1 prep/dish washer-** $12 an hour, no benefits, 2 weeks vacation, 3 personal/sick days, assisting in deliveries.

**Drive 1:**  $15.00-$18.00 with partial insurance after a year.

**Drive 2:**  $13-$16.00

## Kitchen Roles

Miguel-Executive Chef.   Managing all operations of kitchen including cafeteria, ordering, food cost, menu planning, hiring/firing staff, scheduling, overseeing/managing deliveries

Catering Sous chef: managing kitchen crew, over seeing production, preparing all sauces and difficult dishes, inventory of goods,

**2 catering cooks:**  Production for all orders, going to events, handling product coming in, assisting in deliveries

**1 prep cook/dishwasher:**  prep for daily production, cleaning and going to event if needed, assisting in deliveries

**Driver 1:**  Managing all pack out, inventory of china/plastic goods, managing deliveries.making deliveries.   Doing pick up when needed.

**Driver 2:** Making deliveries, pick ups, restaurant depot purchases, specialty pick up

## Catering/Roles

Office:

Julie—will remain Director of Catering and 30% shareholder-managing office, proposals, dealing with clients, walk thru's, organizing each event and making sure everything is run efficiently, management of on site staff

Evalyn- office manager and event manager. Handles small proposals, our social media, helps with organizing specialty items, onsite contact for events, liason between CCNYC and client.

Josh-Event Coordinator (title change may come)—handles day to day proposals, works with clients on events, walk thru's, manages, staffing for events, organizes rentals for clients, seeks new business and follow ups.

Jeannette-Controller- handles all invoicing for clients, accounts recievables, vendor payments, weekly/quarterly reports, payroll. She will handle both the cafeteria and catering along with the help of a CPA coming in to help x amount of days.



==David==—Business development, Managing/overseeing over all operation.  Liason between the event department and the client.

**Revenue made at the end of year (%'s)**
-Bonus will be yearly- 15% to David, Julie and Miguel
-"x" amount to silent partner and silent partners?
-The rest to invest or put into a saving account.

**Cafeteria**
Miguel to take this over in 3-6 months.

**Trucks/Vehicles**
Lease 10ft truck
Perhaps 1 other vehicle

**Questions Still needed to be discussed:**
-Acquire new business cards with both Maiden Lane and CCNYC to hand out.
-how is liability insurance split
-Roles within your company-Maiden Lane (David/Matthew)
-David Salary
-Some kind of system put in place for events in house and how that can be better organized
-
**Staffing for Events**
TBD--discussion

**Exit Strategy**
If after this trial period of x amount, it is not working, whatever was made together will be split in the percentages agreed on and we retain our catering company as it was prior.



BY DAVID

**AD AGE | CREATIVE CONCEPTS NYC**
BASKETBALL CITY | 299 SOUTH STREET PIER 36 | NYC
MONDAY APRIL 4th 2016
TUESDAY APRIL 5th 2016
WEDNESDY APRIL 6th 2016

122 W 26TH STREET GROUND FLOOR NEW YORK NY 10001   212.741.0641   BYDAVIDNYC.COM

# STAFFING ORDER & HOURLY BREAKDOWN

**MONDAY APRIL 4th**

5 ALL PURPOSE

12:00PM – 7:00PM

7 HRS.

**TUESDAY APRIL 5th**

5 SERVERS

10:00AM – 7:00PM

9 HRS.

**WEDNESDAY APRIL 6th**

5 SERVERS

10:0AM – 6:00PM

9 HRS.

CB
BY DAVID

**NOTES:**
APRIL 4th DRESS CODE: JEANS & CCNYC T-SHIRT
APRIL 5th | APRIL 6th DRESS CODE: BLACK ON BLACK NO TIE

CONTACT: JULIE SOMMERS 201.966.8685

| STAFFING CHARGE TOTAL: | $31.00 AN HR./PP 4 HR. MIN APPLIES | $3,875.00 |
|---|---|---|
| ADMINISTRATIVE FEE. | 20% | $- |
| MERCHANT PROCESSING FEE: | 3.5% | $ |
| TOTAL: | | $3,875.00 |

**Terms & Condition**

1. Please sign below your acceptance of this agreement and scan or fax back to us.
2. A deposit of 100% of the total is due upon contract signature to secure the date and production.
3. Upon completion of the event(s) you will receive a final, adjusted statement for any additional costs that were incurred due to actual staff time worked and to incremental client requests.
4. Event staff is guaranteed at the standard minimum of 4 hours regardless of event duration.
5. A finance charge of 1.5% monthly (18%) annually applies to all balances over 30 days from the date of final invoice
6. Clients and guests of events staffed BY DAVID may not for any reason employ, engage, or hire any employee of BY DAVID within six months of the event.

Thank you for choosing BY DAVID. "It is our pleasure to serve you".



BY DAVID

**I have read and accept all terms and conditions of the above contract with BY DAVID COMPANIES, INC.**

Signature: _____

Date: _____

**\*\*\*MAKE ALL CHECKS PAYABLE TO BY DAVID, INC.\*\*\***

Today's Date: _____

Name as it appears on card: _____

Credit Card Number: _____
Expiration Date: _____

Security Number:
For American Express: the 4 digits on the top right corner of the credit card

All other Cards:  the last 3 digits from the signature box on the back of the card

Address of Cardholder: _____

Authorized Signature of Cardholder
Client Signature: _____

BY DAVID