USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/10/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAIDEN LANE HOSPITALITY GROUP LLC and
POTENTIS CAPITAL LLC,

                              Plaintiffs,

-v-

DAVID CORY BECK, BY DAVID COMPANIES, INC.,
and OPAL HOSPITALITY GROUP, INC. *d/b/a* MAIDEN
LANE EVENTS,

                              Defendants.

18 Civ. 7476 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Maiden Lane Hospitality Group LLC ("MLHG") and Potentis Capital LLC ("Potentis") bring 15 claims against defendants David Cory Beck, By David Companies, Inc. ("By David"), and Opal Hospitality Group, Inc. ("Opal"). Plaintiffs broadly allege that Beck, as MLHG's manager, fraudulently induced Potentis to invest in MLHG and then continually lied about it, while funneling money for his own personal use. Defendants counterclaim for indemnification, commission payments, and a rescission of Potentis's interest in MLHG.

Defendants now move to disqualify plaintiffs' counsel and to require MLHG to advance Beck his attorneys' fees and costs. For the reasons that follow, the Court denies Beck's motion in its entirety.

# I. Background

## A. Factual Allegations

The Court briefly summarizes the facts alleged in the Complaint, Dkt. 1 ("Compl."), as well as the facts alleged by the defendants in their filings related to this motion.[1]

MLHG managed and operated certain portions of a commercial building at 180 Maiden Lane, New York, New York pursuant to a Management Agreement. Compl. ¶¶ 25–27; Dkt. 70-3 ("Management Agreement"). In August 2015, to perform its duties under the Management Agreement, Beck, on behalf of MLHG, allegedly had the law firm Okin Edelman P.C. draft a limited liability company Operating Agreement for MLHG. Compl. ¶ 28; Dkt. 70-4 ("Operating Agreement"). The Operating Agreement named Beck and two others as Managers of MLHG. Compl. ¶ 33. The two others later ceased to be Managers, leaving Beck as the sole Manager. *Id.*

In February 2017, while Beck was sole Manager, Beck allegedly solicited Potentis to invest in MLHG. *Id.* ¶¶ 33, 35. On or about March 23, 2017, based allegedly on representations made by Beck and persons assisting him, Potentis and MLHG entered into an Acquisition Agreement. *See id.* ¶¶ 36–41; Dkt. 70-5 ("Acquisition Agreement"). Plaintiffs allege, however, that Beck hid or misstated key financial and accounting information from Potentis while soliciting it, diverted or comingled MLHG funds for his own personal benefit, and improperly put MLHG's vendor accounts under his name. *See generally* Compl. In so doing, plaintiffs allege, Beck at once breached his fiduciary duty to MLHG and perpetrated a fraud on Potentis. *See id.*

---

[1] Defendants filed a motion to disqualify counsel for plaintiffs and for attorneys' fees for defendant David Beck, Dkt. 70, a memorandum of law in support, Dkt. 70-10 ("Def. Mem."), the affidavit of David Beck, Dkt. 71-1 ("Beck Aff."), the declaration of Steven J. Harfenist, Esq., Dkt. 71-2 ("Harfenist Decl."), and accompanying exhibits.

2

Beck disputes these claims. Relevant here, he alleges, in substance, that the fraud that he is alleged to have committed was, if committed, committed on behalf of MLHG. He asserts that he was a founding member of MLHG; that he owns 12% of the company's membership interests, Beck Aff. ¶¶ 4, 13; that he was not MLHG's sole Manager but instead served alongside Joseph Smith, who was an acting Co-Manager, *id.* ¶¶ 5, 7; and that, in addition to serving as a Manager pursuant to the Operating Agreement, he was MLHG's President, with Smith serving as CEO, *id.* ¶ 8, although in August 2017, Beck was voted out of his roles as Co-Manager and President by the other members of MLHG, *id.* ¶ 13. As to the Acquisition Agreement, Beck disputes that it was a product of fraud. He represents that the agreement gave Potentis a 32.50% membership interest in MLHG, making it the largest percentage owner in the business, *id.* ¶ 10, and that, contemporaneous with that agreement, Matt Herfield (Potentis' CEO, Managing Member, and Operating Board Chairman) bought out Smith's membership interest and was appointed to Smith's role as Co-Manager of MLHG, *id.* ¶ 12.

### B. Procedural History[2]

On August 16, 2018, plaintiffs filed the initial Complaint. Dkt. 1. On November 1, 2018, defendants collectively answered with counterclaims. Dkt. 56. On November 30, 2018, plaintiffs answered the counterclaims. Dkt. 64.

On December 3, 2018, the Court held an initial pretrial conference where it set a deadline for an amended answer and the instant motion to disqualify counsel. *See* Dkt. 65. On December 4, 2018, plaintiffs filed an Amended Answer with counterclaims. Dkt. 66. On December 18, 2018, plaintiffs answered the counterclaims in the Amended Answer. Dkt. 69.

---

[2] Plaintiffs have voluntarily dismissed this case against original defendants Creative Concepts NYC, Inc., Zbrella, Inc., and Steven R. Weinstein. *See* Dkts. 46, 81. These defendants have been removed from the caption of the case. *See* Dkt. 81. The Court accordingly does not recite the procedural history relevant to these defendants.

Relevant here, on December 21, 2018, defendants filed a motion to disqualify plaintiffs' counsel and for advancement of Beck's attorneys' fees. Dkt. 70. In support, defendants filed a memorandum of law, Dkt. 70-10, an affidavit from Beck, Dkt. 71-1, a declaration from Steven J. Harfenist, Esq., Dkt. 71-2, and accompanying exhibits. On December 27, 2018, plaintiffs filed a memorandum of law in opposition, Dkt. 72, and a supporting declaration from Stephen M. Forte, Esq., Dkt. 73 ("Forte Declaration"), with an attached email exhibit. On January 18, 2019, defendants filed a letter motion claiming that the email attached to the Forte Declaration was privileged. Dkt. 76. On January 24, 2019, plaintiffs responded. Dkt. 77. On January 31, 2019, the Court granted defendants' letter motion, finding the email privileged, and ordered plaintiffs to refile their memorandum of law without the privileged exhibit. Dkt. 78. On February 4, 2019, plaintiffs filed a revised memorandum of law in opposition. Dkt. 79 ("Pl. Mem.").

## II. Analysis

### A. Disqualification of Counsel

#### 1. Governing Standards

"The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 55 (S.D.N.Y. 2017) (quoting *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005)). In exercising this power, a court must "attempt[] to balance a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." *Id.* (quoting *Hempstead Video*, 409 F.3d at 132). "'Because courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny.'" *Murray v. Met. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)). "[U]nless an attorney's conduct tends to taint the underlying trial, . . . courts should be quite hesitant to disqualify an attorney." *Bd. Of*

4

*Educ. of City of New York v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979) (internal quotations and citations omitted).

"One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client." *Hempstead Video*, 409 F.3d at 133. The Second Circuit has ruled that in cases of concurrent representation, "it is 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client." *Id.* (quoting *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976)). An attorney facing a motion to disqualify based on concurrent representation "must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Cinema 5*, 528 F.2d at 1387.

### 2. Analysis

Defendants move to disqualify plaintiffs' counsel on the theory that MLHG and Potentis are in an adversarial relationship and cannot be concurrently represented. *See* Def. Mem. at 8. This theory pivots on defendants' claim that MLHG, not Beck, made and is responsible for the allegedly fraudulent misrepresentations on which Potentis relied for its investment in MLHG. *Id.* The counterclaims that defendants have brought seeking indemnification and contribution from MLHG for Potentis' fraudulent misrepresentation claims, defendants argue, create a non-waivable conflict for counsel who would represent both MLHG and Potentis. *See id.* Therefore, defendants argue, plaintiffs' current counsel, who has appeared for both Potentis and MLHG, are conflicted from playing this dual role, requiring disqualification.

Plaintiffs counter that Potentis and MLHG's interests are not adverse. Plaintiffs note that both Potentis and MLHG assign personal responsibility to Beck for the alleged fraud. Both plaintiffs allege that, when acting as a purported agent of MLHG, Beck vastly overstepped his

5

valid authority and made misrepresentations to the detriment, ultimately, of both MLHG and Potentis. *See* Pl. Mem. at 9. They argue that Beck's theory presents, at most, a theory of defense to liability and that it does not supply grounds for disqualification; and that defendants' motion for disqualification is a strategic ploy to hamstring plaintiffs' pursuit of their claims against him. In any event, plaintiffs note that, even if this defense were successful, *i.e.*, MLHG were held legally responsible for Beck's unlawful conduct, Potentis has agreed not to then sue MLHG, but to limit itself to remedies available from the existing defendants. *See id.*

The Court finds that the concurrent representation of MLHG and Potentis will not taint the underlying trial and does not necessitate disqualification or come close to doing so. Simply put, defendants' counterclaims do not make MLHG and Potentis's interests irreconcilably adverse. Rather, each, at core, has a predominant interest—synchronous with each other's—in establishing the fraudulent nature of Beck's representations, so as to hold him liable.

The facts here are analogous to those of *Como v. Commerce Oil Co.*, 607 F. Supp. 335 (S.D.N.Y. 1985). There, the defendants contended that the interests of one plaintiff were adverse to the interests of others because the plaintiff at issue had "made misrepresentations and omissions of material fact to the other plaintiffs." *Id.* at 342. Rejecting this theory, the district court concluded that "[t]he basis of this disqualification motion is, in fact, simply an argument that [the singular plaintiff], rather than the defendants, are responsible for injuries to the investor group of plaintiffs. Defendants' argument is a defense, not a viable ground for disqualification of counsel." *Id.* at 343.

So, too, here. First, the conflict imagined by defendants "is still somewhat hypothetical at this point and is not so severe that it may not be waived." *Ritchie v. Gano*, No. 07 Civ. 7269 (VM) (JCF), 2008 WL 4178152, at *11 (S.D.N.Y. Sept. 8, 2008). Second, even if defendants

succeed in their argument that any fraudulent misrepresentation by Beck should be imputed to MLHG, such argument would simply exclude Beck from liability. It would not render Potentis and MLHG necessarily adverse. Potentis still owns the largest stake in MLHG; if it fails to prove Beck and his alleged companies liable, it is not obligated to turn around and sue a business it largely owns.

Beyond that, the Court is mindful that, "[w]hen clients, with knowledge of a possible conflict of interest, reaffirm their desire for joint representation, the Court should be reluctant to disqualify their chosen counsel." *Como*, 607 F. Supp. at 342; *see also Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 925 n.6 (N.D.N.Y. 1987) ("[A] court which satisfies itself that consent has been freely and intelligently given should refrain from paternalistically infringing on a party's right to a lawyer of his choice absent compelling factors indicating that the attorney's loyalty to his client has been incontrovertibly compromised."). And the precedents on which defendants rely, in which a court has ordered disqualification of counsel over the objections of their clients, are quite inapposite.

First, as plaintiffs note, both *Hempstead Video* and *Cinema 5* involved consecutive and concurrent representations of now-adverse parties in which there were serious questions of access by counsel to an adversary's privileged information. Pl. Mem. at 10. In *Hempstead*, an attorney who had previously represented a defendant later became "of counsel" to the plaintiff's law firm. 409 F.3d at 133–35. In *Cinema 5*, the law firm representing the plaintiff also had other pending actions representing the defendant that were "of a somewhat similar nature." 528 F.2d at 1385. There is no such claim here.

Second, in cases in which an adversarial interest in the same action has resulted in forcing disqualification, the adverse interests were much more substantial and acute than those alleged

7

here. For instance, in *Pergament v. Ladak*, No. CV 2011-2797 (ARR) (MDG), 2013 WL 3810188, at *1 (E.D.N.Y. July 23, 2013), cited by defendants, Def. Mem. at 12, the plaintiffs were a corporation, MSD, and its former CEO, president and sole shareholder and director, Nifenecker. After an involuntary petition of bankruptcy was filed against MSD, the appointed Trustee for MSD in the bankruptcy action was substituted as a plaintiff. Defendants provided evidence that it may have been Nifenecker, not them, who diverted funds from MSD. In the end, it was the *Trustee's* lack of consent to the law firm's concurrent representation of MSD and Nifenecker that persuaded the Magistrate Judge that disqualification was warranted, because "[as] the Trustee for MSD, the Trustee has the right to demand undivided loyalty from MSD's counsel." *Pergament*, 2013 WL 3810188, at *8. Unlike here, all plaintiffs, therefore, did not consent to the concurrent representation. The other authorities cited by defendants are even more readily distinguishable.

The Court accordingly finds no charter in the facts or law for the extraordinary remedy of disqualification. Defendants' motion to disqualify is denied.

**B.   Advancement of Attorneys' Fees**

Defendants next argue that Beck is entitled to advancement of his litigation expenses (*i.e.*, attorneys' fees) based on the language of the Operating Agreement. Def. Mem. at 13. They argue that under the Operating Agreement, the advancement obligation does not require that Beck ultimately prove he is entitled to indemnification, but only that Beck supply an unsecured undertaking, an obligation with which he complied. *Id.* Plaintiffs counter that the language of the indemnification clause does not apply to suits between the parties, only to suits involving third parties, Pl. Mem. at 16–18, and that, in any case, Beck was not acting on behalf of MLHG in the actions at issue, and did not give an unsecured undertaking, *id.* at 11–15.

The relevant portions of the Operating Agreement read as follows:

8

**5.8  Indemnification of the Manager, Members and Agents**

   (a) The Day to Day Manager and every Member . . . (collectively, the "Indemnified Group") shall be liable under this Operating Agreement for their respective gross negligence, willful misconduct or fraud . . . .

   (b) In any threatened, pending, or completed action, suit, or proceeding (civil or criminal) to which a member of the Indemnified Group was or is a party or is threatened to be made a party by reason of the fact that it is or was a . . . Day to Day Manager . . . , the Company shall indemnify and hold harmless such member or manager of the Indemnified Group against all expenses (including reasonable attorneys' and accountants' fees, court costs, and expenses) . . . *actually and reasonably incurred by it in connection with such action, suit, or proceeding if the conduct of such Member or Day to Day Manager of the Indemnified Group did not constitute gross negligence, willful misconduct, or fraud.*

   (c) To the extent that a Member or Day to Day Manager of the Indemnified Group has been successful on the merits or otherwise in defense of any action, suit, or proceeding . . . the Company shall indemnify such Member or Day to Day Manager and hold him/it harmless against the expenses (including reasonable attorneys' and accountants' fees and costs) actually and reasonably incurred by it in connection therewith.

   (d) The termination of any action, suit, or proceeding by judgment, order, settlement or otherwise shall not, of itself, create a presumption that the conduct of a member of the Indemnified Group constituted gross negligence, willful misconduct, or fraud and the expenses (including reasonable attorneys' and accountants' fees, court costs, and expenses) incurred in defending any claim, cation, suit, or proceeding (civil or criminal) shall be paid by the Company *in advance* of final disposition of the matter upon receipt of an undertaking by or on behalf of such member of the Indemnified Group to *repay such amount* if such member of the Indemnified Group is ultimately determined not to be entitled to such indemnity by reason of his/.her[sic]/its commission of fraud, gross negligence or knowing violation of law.

Operating Agreement § 5.8 (emphases added).

Defendants argue that, even though plaintiffs have brought fraud claims against Beck in this action, MLHG must still advance fees to Beck, who would be responsible for repaying the amount advanced in the event he is ultimately found to have acted fraudulently. This argument, however, presupposes that the advancement clause applies to suits between the parties to the Operating Agreement, as opposed to between MLHG and its officers, on the one hand, and a

9

third party or parties, on the other. Defendants, tellingly, do not address this argument. They argue instead that the Operating Agreement's "plain language" entitles Beck to advancement. Def. Mem. at 13.

Under New York law,[3] as plaintiffs rightly point out, Pl. Mem. at 16, "[i]nasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear* from the language of the promise." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989) (citations omitted) (emphasis added). Although "[i]ndemnification and advancement of legal fees are two distinct corporate obligations," *Crossroads ABL LLC v. Canaras Cap. Mgmt., LLC*, 963 N.Y.S.2d 645, 646–47 (1st Dep't 2013), *Hooper*'s rule of contract interpretation applies equally to language about advancement contained in indemnification clauses, *see, e.g.*, *In re Platinum-Beechwood Litig.*, Nos. 18 Civ. 6658 (JSR), 19 Civ. 3211 (JSR), 2019 WL 2093914, at *3–4 (S.D.N.Y. May 13, 2019) (applying *Hooper* rule to contract analysis when deciding motion for advancement of litigation expenses); *Gramercy Advisors, LLC v. Coe*, No. 13 Civ. 9069 (VEC), 2015 WL 13780603, at *2–3 (S.D.N.Y. Apr. 17, 2015) (same); *Happy Kids, Inc. v. Glasgow*, No. 01 Civ. 6434 (GEL), 2002 WL 72937, at *2–3 (S.D.N.Y. Jan. 17, 2002) (same). An indemnification clause must be "unmistakably clear" in its intent to apply to suits between contracting parties, as opposed to between third parties and contracting parties. In *Hooper*, the New York Court of Appeals found that a clause that obligated the defendant to "indemnify and hold harmless

---

[3] The Operating Agreement is governed by New York law. *See* Operating Agreement § 11.3 ("This Operating Agreement and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of New York . . . .").

10

[plaintiff] . . . from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees" arising out of breach of warranty claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system "and the like" did not apply to non-third-party claims. 74 N.Y.2d 487, 492 (1989). Rather, the Court of Appeals held, these provisions were "susceptible to third-party claims" and "[n]one [were] exclusively or unequivocally referable to claims between the parties themselves . . . ." *Id.*

Consistent with this principle of New York law, courts in this District have interpreted indemnification clauses broader than the one at issue here to exclude suits between the parties. In *Sequa Corp. v. Gelmin*, for example, the court found that an agreement that referenced "'any and all' claims 'of any kind and nature'—refer[red] solely to the type of claims that are covered, not the identification of parties who may assert those claims." 851 F. Supp. 106, 110 (S.D.N.Y. 1994). The court reasoned that only if "the claims covered refer 'exclusively' or 'unequivocally' to claims between the parties [may] a Court . . . interpret an indemnification agreement to include such claims. If not, then a court must find the agreement to be lacking evidence of the required intent." *Id.* at 110–11 (citation omitted). Similarly, in *Bourne Co. v. MPL Communications, Inc.*, the court rejected the plaintiff's argument that "language in the Agreement which refers to breach of covenants, warranties or representations in the contract can only refer to claims between the parties"; it found that "the parties' intentions to provide indemnification for claims between [them was] not 'unmistakably clear' from the language of the promise." 751 F. Supp. 55, 57–58 (S.D.N.Y. 1990) (quoting *Hooper*, 74 N.Y.2d at 492).

Here, there is nothing in the language of the Operating Agreement that reveals an "unmistakably clear" mutual intent to indemnify managers and officers in suits with MLHG, let alone to advance an adverse party's fees in such litigation. On the contrary, the Operating

11

Agreement elsewhere, although not in § 5.8, explicitly refers to suits between the parties. That provision, § 11.15, states that, in an action solely among parties to the Operating Agreement, arbitration, not litigation, would be the appropriate mechanism for any such suit. *See* Operating Agreement § 11.15 ("In the case of *any dispute* between the parties which has not been resolved through negotiation between the parties, such dispute shall be settled and determined through arbitration . . . ." (emphasis added)). That provision further states that "[t]he prevailing party in any arbitration shall recover its expenses and costs including reasonable attorneys' fees from the other party as determined by the arbitrator." *Id.* And that provision does not contain an advancement provision for such intramural arbitral actions. The presence of such language governing actions between the parties is a strong textual clue that § 5.8, on which defendants rely, was not intended to apply to suits among the contracting parties. In all events, the express reference in § 11.15 to intramural disputes, and the absence of one in § 5.8, precludes any serious argument by defendants that an intent to provide for advancement of the fees of defendants in a suit such as this was "unmistakably clear" from the text of the operative agreement.

Accordingly, defendants' motion for advancement of reasonable attorneys' fees, court costs, and expenses is denied.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to disqualify plaintiffs' counsel and for the advancement of fees. The Clerk of Court is respectfully requested to deny the motion pending at Dkt. 70.

Plaintiffs have indicated their intention to file an amended complaint. Any amended complaint is due two weeks from the date of this Order. Defendants' response is due 21 days from the date the amended complaint is filed.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 10, 2019
      New York, New York